[No. 9080–1–I. Division One. May 17, 1982.]

ALONZO MARQUEZ, *Appellant,* v. THE UNIVERSITY OF WASHINGTON, ET AL, *Respondents.*

*Alonzo Marquez,* pro se.

*Kenneth O. Eikenberry, Attorney General, James B.*

*Wilson, Senior Assistant, Elsa Kircher Cole, Assistant, Reed, McClure, Moceri & Thonn, P.S.,* and *Stephen M. Todd,* for respondents.

ANDERSEN, C.J.—

## FACTS OF CASE

A former law student, Alonzo Marquez, appeals the dismissal of his suit against the University of Washington and certain of its officials. We affirm.

Marquez, of Mexican–American descent, was admitted to the University of Washington Law School (hereinafter Law School) in the fall of 1972 as a special admittee under its affirmative action program. During the school years 1972–73 and 1973–74, the Law School did not have a formal tutorial assistance program for specially admitted students. Informal unstructured academic assistance, however, was available to those students who requested it. The plaintiff did not take full advantage of the opportunities afforded him in that regard.

The Law School requires all law students to maintain a grade point average of 68 in order to continue. Marquez was one of 12 students who earned a grade point average less than the required 68 at the end of his first year. His average was 63.94.

All 12 of those students were individually evaluated according to established standards. The faculty committee terminated Marquez and three other specially admitted first year students. The Dean of the Law School, however, convinced the faculty to retain Marquez and the other three on certain conditions. These four students were required to repeat all classes in which they had not received a grade of 68 or better. They were allowed to drop the lower grade for any course which was repeated rather than

being required to count it in their overall average.

At the end of Marquez' second year, his grade point average was 67.725, just below the required 68 average. Since the established policy of the Law School at the time was not to round grade averages upward, Marquez was again terminated for low scholarship. At the time of this second termination, Marquez was also taking summer school courses at the Law School and the grades in those courses were not included in his cumulative average. The grades he obtained in his summer courses would have lowered, not improved, his grade point average.

In November 1977, Marquez, through his attorney, filed a complaint against the University of Washington and others alleging breach of contract, denial of his equal protection rights and violations of the state Law Against Discrimination, RCW 49.60. By his suit, Marquez sought readmission, $250,000 damages, attorneys' fees and costs. In the spring of 1978, the Superior Court granted the University's motion for a summary judgment of dismissal. Marquez appealed. On April 30, 1979, this court reversed the trial court on procedural grounds, the basis being that at the time summary judgment was entered Marquez had outstanding a motion to compel answers to interrogatories. On remand, additional discovery was done and on July 8, 1980, the Superior Court entered a new order granting the University's motion for summary judgment. Marquez' pro se appeal from that order presents three basic issues.

## ISSUES

ISSUE ONE. Did the trial court err in granting the University's motion for summary judgment on the breach of contract claims?

ISSUE TWO. Did the trial court err in granting the University's motion for summary judgment on the equal protection claim?

ISSUE THREE. Did the trial court err in granting the University's motion for summary judgment on the antidiscrimination claim?

## DECISION

ISSUE ONE.

CONCLUSION. The trial court did not err in granting summary judgment on the contract claims because the uncontroverted facts establish that the University of Washington School of Law did not breach its educational contract with Marquez.

When Marquez applied and was admitted to law school, the prelaw handbook of the Association of American Law Schools provided, in part, the following description of the Law School:

> Special programs—including recruitment, admission, and financial and academic aid—are available for students of minority ethnic groups.

Marquez contends that the above language became part of the contract between himself and the Law School upon his matriculation and that the Law School breached the "academic aid" term by not providing him with a formal structuralized tutorial assistance program.

It is now generally accepted that the relationship between a student and a university is primarily contractual in nature. *Maas v. Corporation of Gonzaga Univ.*, 27 Wn. App. 397, 400, 618 P.2d 106 (1980). "Since a formal contract is rarely prepared, the general nature and terms of the agreement are usually implied, with specific terms to be found in the university bulletin and other publications; . . ." *Peretti v. Montana*, 464 F. Supp. 784, 786 (D. Mont. 1979), *rev'd on other grounds*, 661 F.2d 756, 757 (9th Cir. 1981) quoting Note, *Expulsion of College and Professional Students—Rights and Remedies*, 38 Notre Dame L.J. 174, 183 (1962). For the purposes of this case, we will assume that the singular reference to academic aid contained in the prelaw handbook was definite enough to form a part of Marquez' contract with the Law School.

However, while

> [i]t is apparent that *some* elements of the law of contracts are used and should be used in the analysis of the relationship between plaintiff and the university to

> *provide some framework into which to put the problem
> . . . This does not mean that "contract law" must be
> rigidly applied in all its aspects, nor is it so applied
> even when the contract analogy is extensively
> adopted. . . . The student–university relationship is
> unique, and it should not be and can not be stuffed
> into one doctrinal category. . . .*

*Lyons v. Salve Regina College,* 565 F.2d 200, 202 (1st Cir.
1977), *cert. denied,* 435 U.S. 971, 56 L. Ed. 2d 62, 98 S. Ct.
1611 (1978), quoting with approval from *Slaughter v. Brig-
ham Young Univ.,* 514 F.2d 622, 626 (10th Cir.), *cert.
denied,* 423 U.S. 898, 46 L. Ed. 2d 131, 96 S. Ct. 202 (1975).
Thus, in light of the wide latitude and discretion afforded
by the courts to educational institutions in academic mat-
ters, *Maas v. Corporation of Gonzaga Univ., supra* at 402,
the University is entitled to some leeway in modifying its
programs from time to time so as to properly exercise its
educational responsibility. *Mahavongsanan v. Hall,* 529
F.2d 448, 450 (5th Cir. 1976). The concept of a binding,
absolute, unchangeable contract is particularly anomalous
in the context of postgraduate level work. *Mahavongsanan
v. Hall, supra.*

 In addition, the construction of a contract and the
legal effect of its terms present questions of law for the trial
court which may be properly resolved by summary judg-
ment. *Murray v. Western Pac. Ins. Co.,* 2 Wn. App. 985,
992–93, 472 P.2d 611 (1970). *Accord, Giles v. Howard
Univ.,* 428 F. Supp. 603, 605–06 (D.D.C. 1977). Further,
where, as here, the agreement is not an integrated one, the
standard is that of reasonable expectations—what meaning
the party making the manifestation, the Law School,
should reasonably expect the other party to give it. *Lyons
v. Salve Regina College, supra* at 202, quoting *Giles v.
Howard Univ., supra* at 605. *See* J. Calamari & J. Perillo,
*Contracts* § 3–10, at 118–19 (2d ed. 1970).

Applying the foregoing to the case before us, it is evident
that the prelaw handbook did no more than announce that
certain "programs" including "academic aid" to certain

prospective students "are available". It did not tie the Law School to a specific program or type of "academic aid". Nothing therein created a right in the applicant to obtain a law degree absent his meeting and maintaining reasonable standards established by the Law School. "The possibility of academic failure is implicit in the nature of the educational contract between a student and a university." *Maas v. Corporation of Gonzaga Univ., supra* at 401.

The uncontroverted affidavits and depositions in this case establish that while the Law School, at the time of Marquez' matriculation, did not have a structured or mandatory tutorial assistance program, it did provide other types of academic aid opportunities unusual to law schools at that time.[1] These included the availability of faculty assistance outside the classroom to specially admitted students upon request, small class sections for first year students, a rigidly structured legal writing and research program employing full–time faculty members and the possibility of taking lighter course loads. Marquez did not take full advantage of these opportunities and, in fact, declined offers of out of class assistance from his legal writing instructor.

Furthermore, Marquez was permitted to remain in school after his first year, even though he failed to meet the Law School's grade point requirements, and he was also allowed to expunge his first year's failing grades by repeating courses which he had failed.

There being no issue of material fact with respect to the foregoing, the trial court did not err when it granted a summary judgment dismissing Marquez' case since, on the face of it, the University lived up to its contract with Mar-

---

[1]Prior to Marquez' first year, the Law School did have a formal tutoring program for specially admitted students only. Due to student concern about stigmatization and a general dissatisfaction with the student tutors, however, the program was eliminated and informal voluntary assistance opportunities were substituted. This change was a reasonable modification of the Law School's academic assistance program made in a good faith exercise of its educational responsibility. *See Mahavongsanan v. Hall,* 529 F.2d 448, 450 (5th Cir. 1976).

quez by providing him with academic assistance and the opportunity to obtain additional academic assistance had he desired to take advantage of the opportunities extended.

Marquez also argues that the University breached its contract with him by not rounding off his grade point average upward and by not including his summer school grades in his cumulative average prior to his final termination. Our review of the entire record in a light most favorable to Marquez demonstrates, however, an absence of any issue of material fact respecting the purported promises between Marquez and the Law School. The Law School did no more than follow its established procedures and there is no evidence of a separate agreement.

The summary judgment entered on the contract issues was proper. *See* CR 56(c); *Morris v. McNicol,* 83 Wn.2d 491, 494–95, 519 P.2d 7 (1974).

ISSUE TWO.

CONCLUSION. Because the record does not establish or raise an inference of arbitrary or capricious action on the part of the University, the trial court did not err in granting summary judgment on the equal protection claim.

In his complaint, Marquez alleges that various actions of the Law School regarding his termination and the school's medical leave of absence policy violated his right to equal protection as guaranteed by our state and federal constitutions.

■■ Absent a suspect classification or infringement of a fundamental interest, however, a classification which is rationally related to a legitimate state interest is not violative of a person's right to equal protection. *Reed v. Reed,* 404 U.S. 71, 75–76, 30 L. Ed. 2d 225, 92 S. Ct. 251 (1971); *DeFunis v. Odegaard,* 82 Wn.2d 11, 31, 507 P.2d 1169 (1973), *vacated as moot and remanded,* 416 U.S. 312, 40 L. Ed. 2d 164, 94 S. Ct. 1704, *no action on remand,* 84 Wn.2d 617, 529 P.2d 438 (1974). Because Marquez' equal protection claims are not related to discrimination on the basis of a suspect classification and the right to a university education is not a fundamental interest, *Rosenstock v. Board of*

*Governors,* 423 F. Supp. 1321, 1326 (M.D.N.C. 1976), the "rational basis" test applies.

Further, absent arbitrary or capricious action on the part of the Law School, a court will not interfere with the academic decisions of a university. *Maas v. Corporation of Gonzaga Univ., supra* at 402–03. *See Connelly v. University of Vt.,* 244 F. Supp. 156, 159–60 (D. Vt. 1965).

In the case before us, all the decisions of the University regarding Marquez were made pursuant to reasonable and established school policies and any deviations therefrom were rationally related to legitimate interests of the Law School. There was no showing of an abuse of discretion or of any arbitrary or capricious action. Thus, the trial court did not err in granting defendant's motion for summary judgment as to the equal protection claim.

ISSUE THREE.

CONCLUSION. The trial court did not err by granting summary judgment on the discrimination claim because there is no evidence whatsoever that the University discriminated against Marquez or treated him unfairly.

Before a violation of this state's Law Against Discrimination can be established, the aggrieved party must show "practices of discrimination *against* any of its inhabitants . . ." (Italics ours.) RCW 49.60.010; *see Ellingson v. Spokane Mortgage Co.,* 19 Wn. App. 48, 54–55, 573 P.2d 389 (1978). Here, there is no evidence that Marquez was discriminated against by the University. The record establishes to the contrary and shows that Marquez was treated with great solicitude by the University of Washington and its Law School and was accorded every reasonable consideration in his quest for a legal education. Therefore, a summary judgment of dismissal on this claim, as on the others, was proper.

As the experienced Superior Court judge who ruled on the motions terminating this case in the trial court for the final time summarized it in his oral decision:

> Based on the foregoing resume of special academic considerations granted plaintiff and others similarly situ-

ated, one must reach the inescapable conclusion the plaintiff was extended every reasonable consideration, every reasonable assistance, and every reasonable opportunity to succeed in law school.

No case has been cited, and the Court is unaware of any rule of law that would impose a mandate on a public or private educational institution, i.e., University of Washington Law School, under the circumstances disclosed by this record to assure or guarantee the "making of a lawyer."

The function of such institutions, and the implementation of any affirmative action program, is to afford every reasonable opportunity to such qualified student to succeed. But the major contribution must, of necessity, be borne by the individual himself and not by the state.

Motivation; devotion to the law; perseverance; and addiction to serious studies, are the basic ingredients of anyone seeking such professional career.

Affirmed.

WILLIAMS and CORBETT, JJ., concur.

Reconsideration denied June 16, 1982.

Review denied by Supreme Court October 8, 1982.