[No. 27374-1-III.   Division Three.   September 17, 2009.]

ALPHA KAPPA LAMBDA FRATERNITY, *Appellant*, v. WASHINGTON STATE UNIVERSITY, *Respondent*.

*Timothy H. Esser* (of *Esser & Sandberg, PLLC*), for appellant.

*Robert M. McKenna, Attorney General,* and *Danielle A. Hess, Assistant,* for respondent.

¶1 KULIK, J. — Washington State University (WSU) revoked its recognition of the Alpha Kappa Lambda Fraternity (AKL) for five years upon the Student Conduct Board's (Conduct Board) finding that there had been illegal drug and alcohol use and disregard of WSU policies by AKL members. The Whitman County Superior Court upheld the decision and sanction. AKL appeals, arguing that the Conduct Board's findings are not supported by substantial evidence and that the sanction imposed is arbitrary and capricious.

¶2 Substantial evidence requires a sufficient quantity of evidence to persuade a fair-minded person that the decision is correct. We conclude that the Conduct Board's decision and sanction were supported by the evidence and that a preponderance of the evidence established AKL's violation. We also conclude that in light of the evidence of AKL members' distribution and use of drugs, the five-year sanction was not arbitrary or capricious. Accordingly, we affirm the decision and sanction of the WSU Conduct Board.

FACTS

¶3 *Rules Governing Fraternities at WSU.* A fraternity recognized by WSU has access to WSU privileges and services, including facility use, organizational and recruit-

ing activities, advising, and training sponsored by various WSU offices. In addition, recognized fraternities are eligible for approval to house freshmen, who are required to live in WSU-approved housing.

¶4 In order to be recognized by WSU, a fraternity must sign and comply with the terms of the fraternal organization agreement (FOA). By signing the FOA, the fraternity agrees to a number of requirements, including maintenance of a 2.8 grade point average, employment of a live-in advisor, biannual attendance at training for chapter officers, registration of all social functions, and compliance with WSU policies and state and federal laws.

¶5 The FOA states that a fraternity will be held accountable for the conduct of its members and guests, and that a fraternity is expected to discipline members who violate the rules and expectations of their chapter or WSU. WSU's standards of conduct for students also address group accountability. They provide:

> Sororities, fraternities, and recognized groups shall comply with the standards of conduct for students and with university policies. When a member or members of a student organization violates the standards of conduct for students, the student organization or individual members may be subject to appropriate sanctions authorized by these standards.

WAC 504-26-304.

¶6 As part of their biannual training, fraternity chapter officers receive a copy of WSU's "Group Accountability Statement," which provides additional detail regarding the circumstances under which a fraternity will be held accountable for the behavior of its members. Clerk's Papers (CP) at 41. The document states:

> The conditions under which an organization maintains responsibility for violations of University policies and standards include (but are not limited to):
>
> • the actions constituting the violation were tacitly or overtly condoned by the organization or its officers;

- the organization or its officers should have foreseen yet failed to take reasonable precautions against such actions;

- a policy or practice of the organization was responsible for a violation; or

- the behavior in question was committed by, condoned by or involved organization officers or a significant number of organization members or guests.

In determining whether an organization or its officers failed to take reasonable precautions, the University may take into account the repeated occurrence of relevant other incidents involving the organization.

CP at 41.

¶7 *Proceedings Involving AKL.* On February 5, 2008, Chris Wuthrich, associate director of WSU's office of student conduct, sent a notice of charges to M.W.,[1] the AKL chapter president. In the letter, Mr. Wuthrich expressed concern regarding the alleged drug and drug paraphernalia incidents reported to his office by the Quad Cities Drug Task Force during the fall 2007 term. The letter states that AKL allegedly violated university policies relating to the FOA and alcohol use rules.

¶8 The notice set forth the following violations: (1) failure to have a resident advisor (also known as a live-in advisor) physically reside in the chapter house and failure to properly register social functions; (2) furnishing alcohol to minors at chapter-sponsored social events on chapter property and at the "annex"[2] and the "joint";[3] and (3) use, possession, manufacture, or distribution of marijuana, nar-

---

[1] We refer to students by their initials (Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232).

[2] The annex was adjacent to the AKL chapter house and was owned and controlled by AKL. In the fall of 2008, it was demolished.

[3] The joint is a rental house occupied by AKL members. AKL held numerous parties and functions at the joint. In January 2008, the Greek standards board sanctioned AKL for hazing after freshmen complained that AKL forced the freshman pledge class to clean up the joint every Monday after parties.

cotics, or other controlled substances on AKL property, and at the joint and the annex.

¶9  Also on February 5, 2008, Mr. Wuthrich sent a memorandum notifying M.W. that the AKL hearing would be combined with the hearings of five individual AKL members and affiliates, N.H. (AKL's live-in advisor, who allegedly was not living at the chapter house), E.S. (AKL's social chair), B.B. (AKL's new member educator), B.M., and J.B.

¶10  *Student Conduct Board Hearing.*  The Conduct Board hearing convened on February 13, 2008. Chapter President M.W. and National Executive Director Jeremy Slivinski represented AKL. N.H. and B.M. were also present, and E.S. participated by telephone.

¶11  During the hearing, AKL admitted responsibility for failing to have a live-in advisor. AKL initially pleaded "not responsible" for the charge of furnishing alcohol to minors. CP at 251. Later, however, when the Conduct Board pointed out a photograph showing M.W., a minor, drinking a beer, Mr. Slivinski admitted "we've got underage drinking issues." CP at 305.

¶12  Evidence and testimony presented at the hearing showed drug-related activity by AKL officers, members, and guests occurring on AKL property and at AKL-sponsored events. Evidence and testimony also revealed AKL officers' involvement in, and knowledge of, the drug-related activity.

¶13  Detective Bryce Nebe and Detective John Patrick from the Quad Cities Drug Task Force testified about several controlled buys of cocaine. One of the buys took place at the joint and another near the annex. Detective Nebe testified as follows:

> At that initial meeting, my informant was offered to purchase cocaine from [B.B.] After that was done, we set up controlled buys—first controlled buy actually took place in [B.B.'s] residence . . . which is also referred to as "the Joint."
>
> After that one was done, a second controlled buy was arranged. During that controlled buy, Detective Patrick was in a position to see [B.B.] and another unidentified white male

exit the Annex, meet my confidential informant at a small parking lot and deliver two grams of cocaine. During the entire investigation, a total of four grams of cocaine was purchased.

CP at 256.

¶14 These controlled buys resulted in B.B.'s arrest for two counts of delivery of a controlled substance, cocaine. A search incident to arrest revealed a piece of paper in B.B.'s wallet, containing names and numbers. Based on Detective Nebe's training and experience, he believed the paper to be "crib notes." CP at 256.

¶15 The detective explained that people in the business of dealing with illegal narcotics often keep a running total of who owes them money. The crib note indicated that several other AKL members and officers owed B.B. money for drugs, including E.S., N.H., and C.H., who was AKL's risk manager. B.B. later admitted to Detective Nebe that J.V., another AKL member, owed him $140 for two grams of cocaine. N.H. also admitted to Detective Patrick that he owed B.B. money for marijuana, not cocaine. M.W. acknowledged that B.B. was selling drugs out of the joint.

¶16 Detective Patrick testified that he arrested E.S. on the front porch of the annex. The detective stated that E.S. was arrested for intimidating a witness after an altercation outside a bar. E.S. had threatened someone for speaking to the police about AKL's drug involvement. B.M., who had witnessed the fight, told police he believed the fight was about people snitching. The detective knew of E.S. because a confidential informant claimed to have bought marijuana and Adderall from E.S. in the AKL fraternity house and on the annex property in the spring of 2007.

¶17 Detective Patrick testified that he arrested B.M. for selling drugs after a confidential informant purchased cocaine from him and a search of B.M.'s apartment led to the discovery of significant quantities of Ritalin and Adderall, packaging material, and a digital scale with cocaine residue on it. B.M.'s roommate, J.H. (an AKL member), admitted he had purchased Ritalin and Adderall a couple weeks earlier from B.M.

¶18 B.M., a former AKL pledge, had been kicked out of AKL in his freshman year for selling cocaine. However, during the fall of 2007, he remained a frequent guest at AKL parties and participated in AKL events, including a special event at the annex involving his pledge class, at which he wore an AKL T-shirt created for the event. Importantly, M.W. testified that in order to get into an AKL function or party, you had to be a member of AKL or you had to know someone who was a member.

¶19 Detective Patrick also testified that he arrested N.H. for tampering with a witness after N.H. tried to prevent a female witness from talking to police about his drug activity. During a search incident to the arrest, police found Adderall and Ritalin in N.H.'s backpack. Text messaging records showed that N.H. told the witness's boyfriend that she needed to stop talking to police about N.H.

¶20 Detective Patrick interviewed N.H. following his arrest. During the interview, N.H. told the detective that B.B. had been living at the joint and was selling cocaine out of the house. N.H. said that he and another AKL roommate at the joint knew that B.B. was selling cocaine. N.H. and the roommate told B.B. "they didn't care what he did as long as he didn't keep large quantities in their house and he didn't sell out of the house." CP at 185. N.H. admitted to buying marijuana from two individuals—one of whom was AKL member J.B.—and using cocaine with them.

¶21 Detective Patrick testified that several other AKL members, including R.C., AKL's secretary, were also involved in drug activity. One AKL member, J.V., acted as a middleman for B.B. Detective Patrick further testified about an armed robbery that took place at the annex. The robbery occurred during a multipound marijuana deal arranged by R.C. B.M. also discussed the armed robbery at the annex with detectives and told them that R.C.'s brother may have been involved in the robbery.

¶22 A mantel in the annex was painted with the number 420, which signified that it was marijuana friendly. A photograph showed B.M. posing with AKL members—

including AKL's vice president, C.D.—in front of the 420 mantel.

¶23 Evidence and testimony showed that known drug dealers C.S. and J.B. (also an AKL member) spent considerable time at the AKL chapter house and the joint, and frequently attended AKL functions.

¶24 Detective Patrick testified that J.H. (AKL president through December 2007) and N.H. were aware of C.S.'s drug dealing in the spring of 2007, but continued to allow C.S. to frequent the AKL house and attend AKL functions. Detective Patrick testified that he spoke to J.H. about drug activities at AKL after C.S.'s arrest on November 15, 2007. However, it was only after B.B.'s subsequent arrest that J.H. contacted police and began proceedings to expel B.B. from AKL.

¶25 Mr. Slivinski, AKL's national executive director, acknowledged that the police reports showed that B.B., who was supposed to be educating new members, was dealing cocaine. Mr. Slivinski stated that he identified 12 to 15 AKL members who "have been the sore in this whole process. And you know, [AKL was] trying to get rid of." CP at 306. Mr. Slivinski also acknowledged that the majority of the junior pledge class "is involved with people that have been expelled or are being expelled as well as people that will be under review after this hearing." CP at 303.

¶26 Mr. Slivinski testified that B.B. was expelled from the fraternity in December 2007, but that N.H. and E.S. had not been expelled as of the time of the Conduct Board hearing. E.S. testified that the morning of the hearing was the first time he had been notified AKL was going to initiate proceedings to expel him from the house. N.H. testified that he "stepped down" from his AKL membership and his position as the live-in advisor after he was arrested. CP at 310. AKL did not begin proceedings to expel R.C. until Mr. Wuthrich called M.W. and told him he would be calling the AKL national office.

¶27 *Conduct Board Decision and Administrative Appeal.* On February 21, 2008, the Conduct Board issued its deci-

sion. Based on a preponderance of the evidence, the Conduct Board concluded that AKL was responsible for each of the charges set forth in the notice of charges. Regarding underage drinking, the Conduct Board made the following findings:

> At various "parties" at a live-out referred to as the "Joint," underage members and guests were provided with alcohol. You initially denied this charge, saying that there was no evidence that underage drinkers were ever provided with alcohol. When we pointed out the photo showing you (a 19-year old) holding an alcoholic drink, you admitted that the Chapter was responsible for this violation. One of your members also noted that members of the Chapter were responsible for "door duty" at AKL's live-out (the "Joint") to "keep out the cops" during fraternity parties.

CP at 50. Regarding illegal drug use, possession, manufacture, and distribution, the Conduct Board stated:

> You denied that drugs had been sold on chapter property. However, several of your members—*after* being arrested on drug-related charges—were expelled from the chapter. Moreover, photographs of chapter social events showed the presence of [C.S.] (a known drug dealer) on at least two occasions. In one of those photos, [C.S.] is wearing the "Work Week Date Dash" t-shirt. Another photo shows J.B. (who, along with [C.S.] was arrested for dealing drugs) at the house. Your "New Member Educator" ([B.B.]) was arrested for selling drugs out of the Joint, after police made a controlled buy of 4 ounces of cocaine. When [B.B.] was arrested, his wallet contained a "crib" card—indicating that five of your members owed him money for drug purchases they had made. One of your members, according to [B.M.], had been robbed at gun point of four pounds of marijuana. Finally, we noted that on the mantel of one of the rooms in the "Annex" someone had painted "420" in big letters. In the experience of board members, 420 indicates that a place is "marijuana-friendly."

CP at 50. The Conduct Board also noted that M.W.'s testimony was not credible. It stated:

> Members of the Conduct Board found that you, as the Representative of your Chapter, were not entirely truthful in your

testimony at the hearing. You initially denied, for example, that underage drinking had taken place and only changed your plea when we pointed out the photo of *you* drinking alcohol. You said that no one in the house knew that drugs were being used and sold. Given the amount of drug activity on the part of your members, however, we found that implausible. We also found that the Chapter President perpetuated a fraud when he bribed a member to sign a form agreeing to be live-in advisor; the "New Member Educator" was selling cocaine, and the "Social Chair" was arrested for intimidating a witness.

CP at 50.

¶28 The Conduct Board sanctioned AKL to a five-year period of loss of recognition, followed by a two-year period of disciplinary probation. The Conduct Board stated that its intention in choosing a five-year period of loss of recognition was to ensure that most, if not all, of the current AKL members would have graduated and left WSU before the fraternity regains recognition.

¶29 AKL appealed the Conduct Board's decision, arguing there were procedural errors, the findings were not supported by substantial evidence, and the sanctions imposed were overly severe. On March 26, 2008, the University Appeal Committee affirmed the Conduct Board's decision.

¶30 *Petition for Judicial Review.* AKL subsequently filed a petition for judicial review to the Whitman County Superior Court. AKL argued that the Conduct Board's decision was not supported by substantial evidence, the sanctions were arbitrary and capricious, the Conduct Board engaged in an unlawful procedure and failed to follow prescribed procedures, and that the decision violated AKL's constitutional right to freedom of association. The superior court issued an order and decision rejecting AKL's arguments and affirming the decision of WSU. AKL now appeals.

## ANALYSIS

¶31 Judicial review of an agency action is governed by Washington's Administrative Procedure Act (APA), chapter 34.05 RCW. We may grant relief from the Conduct Board's decision and sanctions only if we determine that

(a) The order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied;

. . . .

(c) The agency has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure;

(d) The agency has erroneously interpreted or applied the law;

(e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;

. . . .

(h) The order is inconsistent with a rule of the agency unless the agency explains the inconsistency by stating facts and reasons to demonstrate a rational basis for inconsistency; or

(i) The order is arbitrary or capricious.

RCW 34.05.570(3).

¶32 When reviewing the decision of an administrative board, the appellate court stands in the same position as the superior court. *Farm Supply Distribs., Inc. v. Wash. Utils. & Transp. Comm'n*, 83 Wn.2d 446, 448, 518 P.2d 1237 (1974). Accordingly, we review the Conduct Board's decision, not the superior court's ruling. *Energy Nw. v. Hartje*, 148 Wn. App. 454, 463, 199 P.3d 1043 (2009). AKL bears the burden of showing that the Conduct Board's decision was invalid. RCW 34.05.570(1)(a).

¶33 AKL contends that the Conduct Board's finding that there had been use and distribution of illegal drugs at the

AKL house and on other AKL property—that was countenanced by the AKL leadership—was not supported by substantial evidence. AKL argues that the only evidence supporting these charges is hearsay or double hearsay from criminal informants. AKL maintains that the admission of this evidence violated the Conduct Board's own rules of procedure and AKL's due process rights. AKL asserts that this evidence is insufficient to meet WSU's burden of proof. AKL's arguments are without merit.

██ ¶34 *Procedural and Due Process Error.* In reviewing an agency action for procedural error, "[t]he court shall grant relief only if it determines that a person seeking judicial relief has been substantially prejudiced by the action complained of." RCW 34.05.570(1)(d). Thus, the petitioner must show that (1) the agency did not correctly follow its own procedure and (2) the irregularity substantially prejudiced the petitioner. Reviewing courts grant substantial weight to an agency's interpretation of its own rules. *Tapper v. Employment Sec. Dep't,* 122 Wn.2d 397, 403, 858 P.2d 494 (1993).

█ ¶35 Here, the admission of evidence from confidential informants did not constitute procedural error. WSU's regulations allow the admission of hearsay evidence in Conduct Board proceedings. Specifically, WAC 504-26--403(4)(a)(xi) provides that the formal rules of process, procedure, and technical rules of evidence, such as are applied in a criminal or civil court, are not used in student conduct proceedings. Most importantly, the regulation provides that "[r]elevant evidence, *including hearsay,* is admissible if it is the type of evidence that reasonable members of the university community would rely upon in the conduct of their affairs." WAC 504-26-403(4)(a)(xi) (emphasis added). The admissibility of the evidence is a matter addressed to the discretion of the chair of the student conduct board. *Id.* Thus, hearsay is not a valid basis for excluding evidence in a student conduct proceeding if reasonable members of the university community would rely on the information in the conduct of their affairs.

¶36 In the present case, AKL argues that information from confidential informants was inadmissible because it was unreliable. Although some of the information presented at the hearing originated from confidential informants, this information was corroborated in numerous respects by the police detectives' personal knowledge, as reflected in their testimony and written reports, and other evidence.

¶37 For example, although initial information regarding B.B. may have come from an informant, Detective Patrick later personally observed a controlled buy of cocaine from B.B. Detective Patrick also personally searched B.B. and found crib notes indicating that other AKL members and officers owed him money for drugs. Moreover, B.B. admitted that one AKL member owed him $140 for cocaine. In addition, N.H. admitted to the detectives that he owed B.B. money for drugs. Therefore, the initial information regarding B.B., which came from a confidential informant, proved to be reliable.

¶38 With regard to E.S., Detective Patrick testified as background information that E.S. came to his attention via a confidential informant, who told him E.S. was selling marijuana and Adderall at the AKL house. As AKL points out, that informant was subsequently fired for not following some of the police department's rules and regulations. Notably, the Conduct Board made no finding regarding whether E.S. had been dealing drugs. The Conduct Board did correctly state, however, that E.S. was arrested for intimidating a witness. This finding was based on Detective Patrick's testimony concerning E.S.'s arrest, which was corroborated by statements from B.M., who witnessed the altercation between E.S. and the individuals.

¶39 On appeal, AKL claims other evidence was unreliable because it was obtained from confidential informants. This evidence includes information regarding C.S.'s affiliation with AKL, J.H.'s knowledge of C.S.'s drug dealing, and B.M.'s cocaine dealing. C.S.'s affiliation with AKL, however, was corroborated by photographs, as well as by information

from B.M. that C.S. had participated in an armed robbery for drugs at the annex.

¶40 Regarding J.H.'s knowledge of C.S.'s drug dealing, Detective Patrick testified that this information came from N.H., not from a confidential informant. Finally, regarding B.M.'s cocaine dealing, initial information from a confidential informant was proved correct by Detective Patrick's subsequent arrest of B.M. and the search of his residence. Therefore, in each case, other evidence proved, or strongly corroborated, information that may have originated from a confidential informant.

¶41 AKL cites *State v. Cole*, 128 Wn.2d 262, 906 P.2d 925 (1995) to support its argument that the confidential informant information was unreliable and should have been excluded. However, *Cole* was a criminal case, not a university student conduct hearing. University students do not have the same rights in conduct hearings as defendants in criminal proceedings. *See* WAC 504-26-403(4)(a)(xi). Nonetheless, the court in *Cole* held that the confidential informant information was sufficiently reliable to justify issuance of the warrant because it was corroborated by subsequent police investigation. *Cole*, 128 Wn.2d at 287-88. Likewise, here, the confidential informant information was strongly corroborated by the subsequent police investigation, as well as by other evidence.

¶42 AKL argues the recent decision in *Alpha Eta Chapter of Pi Kappa Alpha Fraternity v. University of Florida*, 982 So. 2d 55 (Fla. Dist. Ct. App. 2008) should be applied because it is consistent with Washington's due process standards for student disciplinary proceedings. AKL's reliance on *Alpha Eta* is misplaced. In *Alpha Eta*, the court held that a fraternity was denied its right to cross-examine witnesses because all of the evidence at the conduct hearing constituted inadmissible hearsay in the form of videotaped interviews or testimony of officers summarizing the results of their investigations. *Id.* at 56. The court reversed the university's sanction against the fraternity because there

was no competent evidence supporting the charges against the fraternity. *Id.* at 56-57.

¶43 However, in *Alpha Eta*, the officers did not have personal knowledge of the acts alleged, and none of the complaining individuals was present at the hearing. Here, in contrast, several key players—N.H., B.M., and E.S.—were either present at the hearing or appeared by telephone. In addition, Detective Nebe and Detective Patrick had personally initiated and observed controlled buys of drugs and had personally participated in searches in which evidence of drug use and distribution was discovered. Moreover, the court's decision in *Alpha Eta* was based in large part on the university's violation of its own rule, which granted students an unequivocal right to cross-examine adverse witnesses. *Id.* at 56. WSU's rule provides a limited right to cross-examination. WAC 504-26-403(4)(a)(vi). Thus, *Alpha Eta* is not applicable to the present case.

¶44 AKL also argues that by allowing the confidential informant testimony to be admitted at the hearing, WSU violated its own rule requiring a list of witnesses and a description of all documentary evidence relied upon. However, AKL misconstrues the rule which requires WSU to identify witnesses and describe evidence only to the extent known. In this case, the record shows that M.W. and AKL's advisor, Mr. Slivinski, were provided with complete copies of AKL's conduct file. This same information was provided to the Conduct Board. The file contained all of the evidence known, including the investigation reports, names and statements of witnesses, and information pertaining to codefendants.

¶45 In sum, the confidential informant testimony here was sufficiently reliable to be admitted at the hearing. And even without the hearsay, the totality of the remaining evidence was sufficient to establish the violations.

¶46 *Substantial Evidence.* Under the "substantial evidence" standard, an agency finding of fact will be upheld if supported by "evidence that is substantial when viewed

in light of the whole record before the court." RCW 34.05.570(3)(e). For purposes of RCW 34.05.570(3)(e), substantial evidence is "a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order." *Callecod v. Wash. State Patrol*, 84 Wn. App. 663, 673, 929 P.2d 510 (1997).

¶47 The substantial evidence standard, like the arbitrary and capricious standard, is "highly deferential" to the agency fact finder. *ARCO Prods. Co. v. Utils. & Transp. Comm'n*, 125 Wn.2d 805, 812, 888 P.2d 728 (1995). Evidence will be viewed in the light most favorable to WSU as the party who prevailed in the highest administrative forum that exercised fact-finding authority. *City of University Place v. McGuire*, 144 Wn.2d 640, 652, 30 P.3d 453 (2001) (quoting *State ex rel. Lige & Wm. B. Dickson Co. v. County of Pierce*, 65 Wn. App. 614, 618, 829 P.2d 217 (1992)). We accept the fact finder's determinations of witness credibility and the weight to be given reasonable but competing inferences. *Id.* And, just as we do not weigh credibility, we do not substitute our judgment for that of the agency. *See US W. Commc'ns, Inc. v. Utils. & Transp. Comm'n*, 134 Wn.2d 48, 62, 949 P.2d 1321 (1997).

¶48 We note that the Conduct Board's determination was made on the basis of a preponderance of the evidence, "that is, whether it is more likely than not" that the accused party violated the standards of conduct. WAC 504-26-403(4)(a)(x).

¶49 As set forth above, WSU's group accountability statement states the circumstances under which a fraternity will be held accountable for the actions of its members or guests. WSU persuasively argues that, regardless of which of these four standards is applied, and regardless of whether the confidential informant evidence was admitted, AKL was properly held accountable.

¶50 First, the evidence showed that the illegal activity was actively condoned by many of AKL's officers. The new member educator, B.B., was dealing cocaine. The risk manager (C.H.), the live-in advisor (N.H.), and the social

chair (E.S.) had purchased drugs from B.B. Further, N.H. and E.S. both tried to cover up AKL's drug activity by threatening or intimidating witnesses who spoke to police. AKL's secretary (R.C.) was involved in setting up a multipound marijuana deal during which C.S. pulled a gun and robbed a third party. Thus, a number of AKL's officers condoned and participated in drug activity.

¶51 Second, even those officers who may not have been involved in the drug activity failed to take reasonable precautions to stop it. Third, AKL's practices contributed significantly to the drug culture at the house. There was evidence that newer AKL members were unfamiliar with AKL's policies regarding drug and alcohol use and that the person responsible for educating new members about AKL's policies, B.B., was dealing cocaine. The Conduct Board found that many AKL members "were unfamiliar with the official policies of [AKL] concerning drugs and alcohol. That was perhaps surprising, given that the New Member Educator was arrested for selling drugs." CP at 50. The Conduct Board further concluded, "Certainly, their experiences as members of [AKL] have not prepared them to operate responsibly as fraternity members." CP at 51.

¶52 Finally, a significant number of AKL officers, members, and guests were involved in illegal activity. Mr. Slivinski acknowledged there were about 12 or 15 AKL members who "have been the sore in this whole process." CP at 306. Mr. Slivinski also acknowledged that the "majority" of the pledge class "is involved with people that have been expelled or are being expelled as well as people that will be under review after this hearing." CP at 303.

¶53 Fraternities at WSU are expected to comply with the law and WSU policies and to act promptly in response to the illegal behavior of their officers, members, and guests. AKL failed to meet these obligations. Regardless of whether the confidential informant testimony is considered, there was substantial evidence supporting the Conduct Board's decision to hold AKL accountable as an organization for the illegal conduct of its officers, members, and guests.

¶54 *Live-In Advisor Rule.* Next, AKL contends for the first time on appeal that WSU's procedure concerning the charge of failing to have a live-in advisor was defective. Specifically, AKL contends that WSU failed to notify AKL that it did not need to have a live-in advisor if 35 percent or less of the AKL residents were freshmen and also failed to provide AKL with a description of the documentary evidence that would be introduced at the Conduct Board hearing. AKL additionally argues that the charge of failing to have a live-in advisor was improper because the FOA sets forth two inconsistent requirements. WSU responds that AKL waived its right to challenge the Conduct Board's conclusion regarding the live-in advisor requirement. We agree.

¶55 As WSU correctly argues, the APA limits a petitioner's ability to raise issues for the first time on appeal. Specifically, RCW 34.05.554(1) provides that on judicial review of administrative action, "[i]ssues not raised before the agency may not be raised on appeal."

¶56 Our Supreme Court explained that this rule "is more than simply a technical rule of appellate procedure; instead, it serves an important policy purpose in protecting the integrity of administrative decisionmaking." *King County v. Wash. State Boundary Review Bd.*, 122 Wn.2d 648, 668, 860 P.2d 1024 (1993). In fact, RCW 34.05.554 furthers such purposes as aiding judicial review by developing the facts during the administrative proceeding, promoting judicial economy, and " 'perhaps even obviating judicial involvement.' " *Id.* at 669 (quoting *Fertilizer Inst. v. U.S. Envtl. Prot. Agency*, 935 F.2d 1303, 1312-13 (D.C. Cir. 1991)).

¶57 Here, AKL argues that WSU's procedural deficiency and inconsistency in the policy it alleges was violated cannot support WSU's sanction. AKL, however, did not raise these issues before either the Conduct Board or the University Appeal Committee. Instead, AKL admitted that it had failed to have a live-in advisor at the AKL house, as required by the FOA. Likewise, in its written appeal to the

University Appeal Committee, AKL raised a number of procedural and substantive issues, but did not raise any issues regarding the live-in advisor charge. Because AKL failed to raise this issue during the student conduct proceedings, it was not entitled to raise it for the first time on appeal. Thus, we decline to further consider this issue.

¶58 *Arbitrary and Capricious Sanction.* AKL also argues that the Conduct Board's decision to revoke recognition for five years was arbitrary and capricious. AKL further claims that the entire fraternity was punished for the actions of only two members and one occasional visitor that were found to be in violation of WSU policies. Finally, AKL argues that the punishment was not commensurate with the conduct, but rather was intended to send a message to the rest of the WSU Greek community about reducing the prevalence of drug use and underage drinking. AKL's arguments are without merit.

¶59 RCW 34.05.570(3)(i) states that a court may grant relief from an agency order if the order is "arbitrary or capricious." A decision is arbitrary or capricious for purposes of RCW 34.05.570(3)(i) if it is a " 'willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action.' " *Bowers v. Pollution Control Hearings Bd.*, 103 Wn. App. 587, 596, 13 P.3d 1076 (2000) (internal quotation marks omitted) (quoting *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38, 46-47, 959 P.2d 1091 (1998)). Significantly here, the harshness of the sanctions imposed is not the test for arbitrary or capricious action. *Heinmiller v. Dep't of Health*, 127 Wn.2d 595, 609, 903 P.2d 433 (1995); *Keene v. Bd. of Accountancy*, 77 Wn. App. 849, 859-60, 894 P.2d 582 (1995) (noting that the suspension of an accountant's license for five years was a harsh sanction but declining to find it arbitrary or capricious).

¶60 "If there is room for two opinions, a decision is not arbitrary or capricious if it is made honestly and upon due consideration, even though we think a different conclusion

might have been reached." *Bowers*, 103 Wn. App. at 596. Accordingly, our scope of review under an arbitrary or capricious standard is very narrow, and the one asserting it "must carry a heavy burden." *Pierce County Sheriff v. Civil Serv. Comm'n for Sheriff's Employees of Pierce County*, 98 Wn.2d 690, 695, 658 P.2d 648 (1983).

¶61 The Conduct Board has the authority to determine appropriate sanctions in student conduct proceedings. WAC 504-26-405(5). The standards of conduct for students lists a number of possible sanctions that may be imposed, including loss of recognition. WAC 504-26-405(1).[4] Likewise, sanctions for violating the FOA include warnings, reprimands, restitution for property damage, monetary fines, probation, suspension, withdrawal of recognition, and withdrawal of freshman housing privileges.

¶62 Here, the Conduct Board's decision to impose a five-year period of nonrecognition was based on substantial evidence showing numerous violations of law and WSU policy, committed by many officers, members, and guests of AKL.[5] AKL's culture permitted illegal drug and alcohol use and distribution, as well as routine disregard of WSU policies. As the Conduct Board explained in its decision, the

---

[4] WAC 504-26-405 provides in relevant part:

(1) The following sanctions may be imposed upon any student found to have violated the standards of conduct for students:

. . . .

(n) Loss of recognition. A student organization's recognition may be withheld permanently or for a specific period of time. A fraternity or sorority may be prohibited from housing freshmen. Loss of recognition is defined as withholding university services, privileges or administrative approval from a student organization. Services, privileges and approval to be withdrawn include, but are not limited to, intramural sports (although individual members may participate), information technology services, university facility use and rental, campus involvement office organizational activities, and office of Greek life advising.

[5] Mr. Slivinski stated that he found in his investigation that "it was obvious that our younger members were not trained appropriately on what's right and what's wrong in regards to . . . functions and policy. . . . [S]ome of the guys apparently were confused in regards to what they could or couldn't do as a chapter in those types of events. . . . So there's a lapse in education and part of it, you know, you look at the person that was educating them, and the guy was dealing cocaine. You look at the . . . culture that you identified." CP at 305.

period of five years was chosen to ensure that most, if not all, current members of AKL would have left WSU by the time AKL is eligible to regain recognition. The sanction was within the Conduct Board's discretion.

¶63 Finally, AKL seeks an award of attorney fees and costs pursuant to the equal access to justice act, RCW 4.84.340. RAP 18.1(a) allows attorney fees on appeal if they are authorized by applicable law.

¶64 RCW 4.84.350(1) provides that a court "shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust." A qualified party prevails if it "obtain[s] relief on a significant issue that achieves some benefit" that the party sought in the judicial review proceeding. RCW 4.84.350(1). AKL does not prevail and, consequently, is not entitled to attorney fees and costs.

¶65 We affirm the decision and sanction of the WSU Conduct Board and deny attorney fees and costs to AKL.

SCHULTHEIS, C.J., and KORSMO, J., concur.