IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

PRABHJOT KANG,

                  Appellant,

        v.

WESTERN GOVERNORS
UNIVERSITY, a foreign nonprofit
corporation; and WESTERN
GOVERNORS UNIVERSITY-
WASHINGTON, a Washington
nonprofit corporation,

                  Respondents.

No. 83460-6-I

DIVISION ONE

UNPUBLISHED OPINION

BOWMAN, J. — Western Governors University (WGU) discovered five plagiarized papers Prabhjot Kang submitted as a student there. WGU sanctioned Kang for academic dishonesty. Kang sued WGU for breach of contract; violation of the Consumer Protection Act (CPA), chapter 19.86 RCW; and discrimination under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, asserting that Hindu East Indian employees of WGU manufactured evidence against her because of her Sikh religion and Punjabi ethnicity. The trial court granted summary judgment dismissal for WGU. Because Kang presents no competent evidence supporting the essential elements of her claims, we affirm.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

WGU is an online, private academic institution. WGU-Washington is a wholly-owned subsidiary of WGU (collectively WGU). Between November 2013 and April 2016, Kang attended WGU and graduated with a bachelor's degree in business management. Then, in May 2017, Kang enrolled in a master of business administration (MBA) program.

Like all WGU students, Kang agreed to abide by a "Code of Student Conduct" (Code), which prohibits acts of academic dishonesty, including plagiarism. WGU defines "plagiarism" as

> the use, by paraphrase or direct quotation, of the published or unpublished work of another person without full and clear acknowledgment. It also includes the unacknowledged use of materials prepared by another person or agency engaged in the selling of term papers or other academic materials.

In its Code, WGU reserves the right to review all work submitted to the university. To verify its students produce original work, WGU requires them to submit written assignments through a plagiarism detection software called "Turnitin." WGU encourages students to submit their drafts to Turninit to check for plagiarism before they submit their final draft.

In October 2018, the WGU Assessment Security and Authenticity Department (Authenticity Department) conducted an "originality review" of Kang's work. WGU explained that it investigated Kang because another investigation implicated much of her work.[1] It determined that five papers Kang submitted between May 2017 and June 2018 plagiarized other students' work.

---

[1] The other investigation involved Kang's sister, who was also an MBA student at WGU.

Authenticity Department personnel determined that Turnitin did not flag Kang's assignments for plagiarism because they fell within its "allowed threshold." Still, it appeared to the Authenticity Department that Kang was committing "thought-progression" plagiarism. She started with another student's paper and reworded it, or revised it down, "to the point that the language was different enough that Turnitin would likely not catch it but the original author's thought process and ideas were still obvious." The Authenticity Department created side-by-side comparisons of each of Kang's papers with the papers it alleged she plagiarized. The Authenticity Department also obtained metadata from two of Kang's papers showing other students as the original authors of the files.

The Authenticity Department referred its findings to the WGU Office of Student Conduct. WGU assigned the case to student conduct officer Kumar Pandya. Pandya notified Kang by e-mail that the Authenticity Department referred her work to his office for plagiarism. He attached the supporting evidence. That same day, Kang met with Pandya by telephone to discuss the alleged plagiarism. Pandya recorded the call per Code policy.

During that meeting, Kang first defended her work by suggesting that the papers matched other students' work because she shared a laptop with her sister. When Pandya informed Kang that the papers matched students' work other than her sister's, Kang suggested that "when thousands of students are writing about the same stuff and there are thousands of papers floating out there, then it's bound to match[ ] something" because "[t]here are only so many ways

you can write something." Kang then asserted she relied on the Turnitin software to ensure her work did not "accidentally" match someone else's, and that Turnitin never flagged her drafts. After hearing her defenses, Pandya told Kang that he did not believe she was being truthful and that the WGU Student Conduct Board (SCB) would schedule a hearing to determine whether there was evidence of a student conduct violation. The SCB consisted of four voting members and Pandya, a nonvoting member.

Before the SCB hearing, Kang submitted a letter to the board stating the same defenses. At the hearing, the SCB heard from two Authenticity Department investigators. The investigators described each instance of plagiarism they found in Kang's papers and presented their evidence. The SCB then heard from Kang, who again denied plagiarizing other students' work, but offered more explanations. She encouraged the SCB to "look at things outside the box and see there are other ways that things could happen." Kang offered that Turnitin "could have a glitch" or could have been "hacked" because "lots of companies have gotten hacked." Kang also offered that she had no access to her original documents, so "there could be human [s]henanigans, there could be hacking, there could be file corruption."

After the hearing, the SCB determined that there was clear and convincing evidence that Kang violated the Code's prohibition against plagiarism and imposed sanctions. The SCB issued a "Level 2 Conduct Warning" on Kang's permanent disciplinary record. It "zeroed out" the grades for four of the papers and required Kang to rewrite them. It changed Kang's grades in two classes to

"not passed" until she submitted original papers. And it required Kang complete an online ethical development seminar at her cost and submit a two-page reflection essay on academic integrity and professional ethics.

Kang appealed the SCB's decision to the WGU Appellate Board. In preparing her appeal, Kang e-mailed Pandya, seeking declarations from him and SCB panel member Dr. Gauri Sawant attesting that "they have no affiliations, connections, or communications with any East Indian political parties/entities in the United States, India, or elsewhere," or recuse themselves. Kang made the same request of appeal board member Dr. Rashmi Prasad. Kang explained that she was asking not because of "their race, religion, gender, ethnicity, national origin, skin color, etc." but "only because of their political affiliation to a foreign state." The WGU employees did not provide the requested declarations or recuse themselves.

Kang then submitted a nine-page letter and attached 10 exhibits in support of her appeal. She generally denied plagiarizing and argued that the SCB reached the wrong conclusion. She then, again, broadened the scope of her defense. Urging the Appellate Board to "think outside the box" to "unravel the real facts of this saga," she argued that the metadata evidence was "[d]octored," that WGU deliberately targeted her for investigation, that Pandya was scheming against her, and that the SCB's decision was "[a] convenient tool for [her] personal destruction in the East Indian community." Kang labeled the disciplinary proceedings as "ongoing propaganda against [her] about [her] intelligence" because of her Sikh religion and Punjabi ethnicity. She called them

"a highly sophisticated attempt to achieve [her] personal destruction and to damage the reputation of [her] parents," which she claimed was in line with the "pattern of propaganda in the gender biased East Indian community."  She then discussed rumors "circulating in the East Indian community for almost a quarter century" about her being "a dumb girl" because of circumstances involving her birth after her mother experienced a complicated pregnancy.

After reviewing the verbatim record of the SCB hearing and supporting documents as well as Kang's submitted material, the Appellate Board concluded that the SCB hearing was fair and "in conformity with prescribed procedures."  It determined that the decision rested on "substantial" evidence and that the sanctions were proportionate.

Kang sued WGU in May 2019 and filed an amended complaint in September 2019.  She asserted claims of breach of contract and violation of the CPA, alleging that WGU failed to follow its policies in the Code.  Kang also asserted a claim under the WLAD.  She alleged that Hindu members of the SCB and Appellate Board, working as "agents of the foreign political and religious entities of East Indian descent," targeted her and fabricated a plagiarism case against her because of her Sikh religion and Punjabi ethnicity.  She claimed that the SCB and Appellate Board used the WGU disciplinary proceedings "as a breeding ground to hatch a conspiracy against" her to destroy her career, destroy the reputation of her parents, and to "take revenge" because of her and her father's "role in bringing down the state Government in East Punjab (India)

6

through our literary and artistic activities on social media as well as on the ground."

In January 2021, WGU moved for summary judgment dismissal of Kang's lawsuit. It argued Kang failed to produce "any actual evidence" to establish the essential elements of each of her claims. Kang responded by filing a declaration in which she denied facts alleged in the underlying disciplinary action and questioned the legitimacy of various documents presented to the SCB. She asserted that WGU submitted "falsified" and fraudulent evidence, attributing the "corrupted" evidence to "the three Hindu agents of WGU," Pandya, Dr. Sawant, and Dr. Prasad.

The court heard oral argument on the motion on Friday, February 5, 2021. At the end of the hearing, the court granted summary judgment for WGU on Kang's breach of contract and CPA claims. On the following Monday, the court granted summary judgment for WGU on Kang's WLAD claim, and entered an order dismissing Kang's lawsuit with prejudice.

Kang appeals.

## ANALYSIS

Kang argues that the trial court erred by granting summary judgment for WGU because she raised genuine issues of fact sufficient to support each of her claims.[2] We disagree.

---

[2] WGU urges us to decline review of Kang's assignments of error because her brief does not comply with RAP 10.3(a)(6). But RAP 1.2(a) calls for a liberal interpretation of the rules "to promote justice and facilitate the decision of cases on the merits." Viereck v. Fibreboard Corp., 81 Wn. App. 579, 582, 915 P.2d 581 (1996). Because Kang adequately identifies her assignments of error and generally supports them with argument, we consider the merits of her appeal.

We review rulings on summary judgment de novo, performing the same inquiry as the trial court. Kruse v. Hemp, 121 Wn.2d 715, 722, 853 P.2d 1373 (1993). Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c). The moving party bears the burden of proving that there is no genuine issue as to any material fact. Lamon v. McDonnell Douglas Corp., 91 Wn.2d 345, 349, 588 P.2d 1346 (1979). We consider all facts submitted and all reasonable inferences that can be drawn from those facts in the light most favorable to the nonmoving party. Ellis v. City of Seattle, 142 Wn.2d 450, 458, 13 P.3d 1065 (2000).

A defendant may move for summary judgment by showing the plaintiff lacks competent evidence to support an essential element of their case. Guile v. Ballard Cmty. Hosp., 70 Wn. App. 18, 25, 851 P.2d 689 (1993). If the defendant makes this showing, the burden shifts to the plaintiff to establish the existence of the essential element. Pagnotta v. Beall Trailers of Or., Inc., 99 Wn. App. 28, 36, 991 P.2d 728 (2000). The plaintiff must present specific facts showing a genuine issue for trial. Pagnotta, 99 Wn. App at 36. The plaintiff cannot meet this burden by responding with conclusory allegations, speculative statements, or argumentative assertions. Pagnotta, 99 Wn. App at 36. If the plaintiff fails to meet their burden, summary judgment for the defendant is proper. Knight v. Dep't of Labor & Indus., 181 Wn. App. 788, 795-96, 321 P.3d 1275 (2014).

Breach of Contract

Kang contends she presented competent evidence that WGU breached its contract and the implied covenant of good faith and fair dealing by failing to follow its written disciplinary procedures and failing to provide her a fair disciplinary hearing.

To prevail on a breach of contract claim, a plaintiff must establish a contractual duty, breach of that duty, and that the breach proximately caused the plaintiff damage. Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus., 78 Wn. App. 707, 712, 899 P.2d 6 (1995). And to show breach of an implied duty of good faith and fair dealing, a plaintiff must establish that the defendant did not perform in good faith the specific obligations imposed by their agreement. Bill & Melinda Gates Found. v. Pierce, 15 Wn. App. 2d 419, 433, 475 P.3d 1011 (2020), review denied, 197 Wn.2d 1006, 483 P.3d 785 (2021); Rekhter v. Dep't of Soc. & Health Servs., 180 Wn.2d 102, 113, 323 P.3d 1036 (2014).

Generally, we view the relationship between universities and their students as contractual. Marquez v. Univ. of Wash., 32 Wn. App. 302, 305, 648 P.2d 94 (1982); Maas v. Corp. of Gonzaga Univ., 27 Wn. App. 397, 400, 618 P.2d 106 (1980). Since a formal contract between a university and a student rarely exists, we look to the implied provisions found in university publications to determine the general nature and specific terms of the student-university agreement. Marquez, 32 Wn. App. at 305.

Courts routinely distinguish the contractual responsibilities of public universities and private universities when making discretionary academic or

9

disciplinary decisions.  See Boehm v. Univ. of Pa. Sch. of Veterinary Med., 392 Pa. Super. 502, 509, 573 A.2d 575 (Pa. Super. Ct. 1990).  That is because students of public universities are entitled to constitutional due process protections, so public university disciplinary decisions are subject to greater judicial scrutiny.  See Alpha Kappa Lambda Fraternity v. Wash. State Univ., 152 Wn. App. 401, 413, 216 P.3d 451 (2009) (Washington State University disciplinary decisions are subject to review under the Administrative Procedure Act, chapter 3.05 RCW).  But courts are more reluctant to interfere in the disciplinary proceedings of a private college.  Boehm, 392 Pa. Super. at 509.

No published Washington case directly addresses the standard by which we evaluate whether a private university's disciplinary decision breached its contractual duty to a student.  But we have turned to decisions from other jurisdictions in that regard.  See Marquez, 32 Wn. App. at 305-09 (relying on non-Washington cases in analyzing University of Washington's academic decision); Maas, 27 Wn. App. at 400-03 (following cases from other jurisdictions in deciding standard for review for private university's academic decisions).  And several other jurisdictions have recognized that students of private universities are entitled to at least the basic tenets of fundamental fairness in disciplinary proceedings.  See Boehm, 392 Pa. Super. at 510; Shah v. Union Coll., 97 A.D.3d 949, 950-51, 948 N.Y.S.2d 456 (N.Y. App. Div. 2012).

To ensure fundamental fairness in disciplinary proceedings, private universities must (1) substantially comply with their published policies and (2) not subject students to arbitrary or capricious decisions.  Boehm, 392 Pa. Super. at

10

510-11; Shah, 97 A.D.3d at 950-51.[3]  A university acts arbitrarily and capriciously when it takes " 'willful and unreasoning action . . . without regard to or consideration of the facts and circumstances surrounding the action.' "  Alpha Kappa Lambda, 152 Wn. App. at 421[4] (quoting Bowers v. Pollution Control Hr'gs Bd., 103 Wn. App. 587, 596, 13 P.3d 1076 (2000)).  " '[A] decision is not arbitrary or capricious if it is made honestly and upon due consideration.' "  Alpha Kappa Lambda, 152 Wn. App. at 421 (quoting Bowers, 103 Wn. App. at 596).

WGU's Code establishes its procedures for adjudicating charges of academic dishonesty.  WGU must give written notice to the student and seek to reach a mutually agreeable resolution.  If WGU and the student cannot reach an agreement, WGU will set a SCB hearing at which the WGU investigator presents his or her findings, the student has a chance to present information, and the SCB members deliberate about whether the accused student has violated the Code.  If the SCB decides that the investigator proved the violations by clear and convincing evidence, the board may direct the student conduct administrator to impose any of the sanctions provided in the Code, which range from a "Level 1 Warning," to "Disciplinary Expulsion," to "Revocation of Admission and/or Degree."

The record shows that WGU afforded Kang the adjudication processes and protections established in the Code.  In her response to summary judgment, Kang asserted that WGU deviated from its published policies by imposing a

---

[3] Kang and WGU agreed that this standard applied to her breach of contract claim below.  Neither argues differently on appeal.

[4] Internal quotation marks omitted.

"Level 2 Warning" as a sanction instead of "the level she was entitled to for an alleged first-time disciplinary violation." But WGU's Code gives discretion to the SCB to impose any level of sanction it deems appropriate for a student found to have violated the rules.

The record also shows that WGU's decision to sanction Kang was not arbitrary or capricious. WGU first looked into Kang's work after investigating her sister and finding the two submitted similar work product. On deeper investigation, WGU discovered other times when Kang plagiarized the work of others, and commenced disciplinary proceedings. WGU's Authenticity Department presented evidence of the alleged plagiarism to the SCB. The SCB considered the evidence, including Kang's response; found the Authenticity Department proved the plagiarism allegations; and imposed a sanction authorized by WGU's Code. The Appellate Board then reviewed the decision. It heard argument and again considered the merit of Kang's claims before upholding the SCB's decision.

Kang claims that the SCB's decision was arbitrary and capricious because the case against her rested on forgeries and fraud, motivated by "agents of East Indian descent . . . plotting to harm [her], due to their biases." But Kang's depictions of fraud, forgery, bias, and discrimination against her are conclusory allegations based on speculation and cannot defeat summary judgment. Pagnotta, 99 Wn. App at 36. The trial court did not err in dismissing Kang's breach of contract claim at summary judgment.[5]

---

[5] Because Kang's CPA claim is predicated on her breach of contract claim, the CPA claim also fails.

WLAD

Kang argues that she established a prima facie case of discrimination under the WLAD because she showed that WGU "agents of East Indian descent" plotted "to harm [her], due to their biases."

The WLAD guarantees the right to "be free from discrimination because of race, creed, color, [or] national origin." RCW 49.60.030(1). That guarantee extends to all places of public accommodation. RCW 49.60.030(1)(b).

We analyze WLAD claims under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See Domingo v. Boeing Emps.' Credit Union, 124 Wn. App. 71, 77, 98 P.3d 1222 (2004), abrogated on other grounds by Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County, 189 Wn.2d 516, 404 P.3d 464 (2017); see also Hartleben v. Univ. of Wash., 194 Wn. App. 877, 883-84, 378 P.3d 263 (2016). Under that framework, a plaintiff must first show a prima facie case of discrimination. Domingo, 124 Wn. App. at 77. If the plaintiff cannot meet that burden, the inquiry stops, and the defendant is entitled to summary judgment. Domingo, 124 Wn. App. at 77-78.

To make a prima facie showing of discrimination, Kang had to show (1) she is a member of a protected class, (2) WGU is a place of public accommodation, and (3) WGU treated her differently than other similarly situated students (4) because of her membership in that protected class. McDonnell Douglas, 411 U.S. at 802; Hartleben, 378 Wn. App. at 883-84.

13

WGU concedes that Kang's Punjabi ethnicity and Sikh religion make her a member of a protected class and that WGU is a place of public accommodation. But Kang fails to show that WGU treated her differently than other similarly situated students because of her membership in a protected class. Kang offers no evidence WGU disciplined her any differently than other students at WGU accused of plagiarism. Nor does she show the WGU employees involved in her disciplinary proceedings were aware of her Sikh religion, Punjabi ethnicity, or political affiliation. And Kang's allegations that several of WGU employees are "Hindu agents" motivated to manufacture evidence against her are speculative and do not amount to a prima facie showing of discrimination under the WLAD. [6]

Because Kang failed to establish the essential elements of her claims, the trial court did not err in granting summary judgment for WGU.

We affirm dismissal of Kang's lawsuit with prejudice.

Brenner, J.

WE CONCUR:

Coburn, J.                    Andrus, A.C.J.

---

[6] Indeed, the record shows that at least one of Kang's claimed WGU "Hindu agents" is not Hindu. In his declaration, Pandya was "surprised" that Kang claimed "under the penalty of perjury in her discovery responses . . . that she 'knows' I am Hindu. I am not."