# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| GREENHOUSE GROUP, LLC, a Washington limited liability company, | No. 80803-6-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| WASHIGNTON STATE LIQUOR AND CANNABIS BOARD, a governmental agency of the state of Washington, | |
| Respondent. | |

APPELWICK, J. — Greenhouse challenges the order of the Washington State Liquor and Cannabis Board affirming denial of its application for a recreational marijuana license in Seattle. Greenhouse claims the LCB review of its application was not fair and impartial because the LCB did not review its application materials on a "first come, first served" basis. We affirm.

## FACTS

In 2015, the legislature passed the cannabis patient protection act (CPPA), which standardized the delivery of medical marijuana by combining the recreational and medical market under the regulation of the now-named Washington State Liquor and Cannabis Board (LCB). LAWS OF 2015, ch. 70, §§ 1-3 (Initiative 502). To accomplish this, the CPPA mandated the closure of collective gardens that had been providing medical marijuana patients with cannabis. LAWS OF 2015, ch. 70, §§ 49-50. The CPPA instead contemplated that medical

marijuana patients would procure marijuana through licensed retail shops. LAWS OF 2015, ch. 70, §§ 8. The CPPA gave the LCB authority to determine the number of licenses to be awarded, but instructed that that determination must meet the needs of medical marijuana patients. LAWS OF 2015, ch. 70, § 8(2). It also compeled the LCB to adopt a competitive, merit-based application process to review applicants in a fair and impartial way. LAWS OF 2015, ch. 70, § 6(1). The CPPA mandated that license applicants be sorted into an order of priority. LAWS OF 2015, ch. 70, § 6(1)(a). First priority is given to those who had previously applied for a retail license prior to July 1, 2014, previously worked at a collective garden, had maintained state and municipal business licenses, and had a history of paying applicable taxes.. LAWS OF 2015, ch. 70, § 6(1)(a)(i). After the passage of the CPPA, the LCB made an additional 222 retail licenses available across the state. Of those, 22 were allocated to the Seattle market. The LCB began accepting applications for new licenses on October 12, 2015. The application evaluation process occurred in four phases. First, applicants submitted information to determine their order of priority. Next, their application was sent to a licensing specialist to gather all necessary information and ensure its accuracy.[1] Once the information was verified and fully reviewed, the application was sent forward to the next phase, a supervisory review between the licensing specialist and their supervisor. After the supervisory review, the application was forwarded to the LCB enforcement division, who conducted a site inspection of the proposed store to

---

[1] Because of the volume of applications, the LCB determined that only priority 1 applications would move on to phase 2.

2

ensure it complied with the LCB rules. After these steps, the application moved forward for licensure.

In order to ensure a fair process, the LCB investigators were instructed to review applications in the order received. This meant that they could not begin work on a new application until they had done what they could with previously received applications. But, if the investigator did not receive all documentation necessary to complete their review, they were permitted to move on to other applications before completing review of the incomplete application.

Greenhouse Group, LLC (Greenhouse) submitted its license application for the Seattle market on October 14, 2015. On October 26, the LCB requested documents to determine Greenhouse's priority status.[2] Greenhouse returned these forms 29 days later, on November 24. An LCB employee testified that 29 days was an unusually long time to return these documents. They further testified that other applicants returned their priority documents in 1-9 days. Applicants who return these documents sooner are able to get their applications processed more quickly.

After Greenhouse submitted its documentation, the LCB requested additional priority documentation because the information it had provided was incomplete. Greenhouse submitted this information on December 4. Greenhouse was assigned priority 1 status on December 8. Its application was assigned to licensing specialist Kimberly Chabot on December 17. Chabot was an

---

[2] These documents included a priority verification form, financial, tax, and employment documents for Rajiv Pottabathni, as well as information related to Greenhouse's formation and licensing.

experienced licensing specialist who processed more successful applications than any other licensing specialist in the state.

The same day she was assigned Greenhouse's application, she called Greenhouse and conducted an initial interview. She spoke with Rajiv Pottabathni, who represented himself as the sole owner of Greenhouse. But, she was unable to complete the interview because Pottabathni was unable to provide all the information necessary. Chabot scheduled and completed the interview the next day. She testified that it was very unusual for Greenhouse to be unable to provide the necessary information at that stage in the process.

In that initial interview, Pottabathni indicated that he and his financiers had already completed the required fingerprint submissions. Chabot communicated to Pottabathni that he needed to give the fingerprint processor a specific code to ensure that the results would get back to LCB quickly. Because Pottabathni's financiers did not have the code when they completed their fingerprints, they needed to have their fingerprints retaken. They completed this on December 17. Chabot testified that failure to provide the LCB code when getting fingerprints can delay the process.

On December 20, Chabot sent Greenhouse a letter outlining the required documentation she would need to move forward with Greenhouse's application. Greenhouse submitted the bulk of these documents on December 29. Chabot testified that many applicants were able to return this information within 24 hours.

The record is not clear when Chabot reviewed these submissions in sufficient detail to request additional documentation from Greenhouse.[3]

Greenhouse's financial disclosures raised several "issues" for Chabot. One of the e-File forms submitted with its priority determination did not conform to IRS formatting. Pottabathni's name was different on the form and it appeared to Chabot to have been altered. Chabot did not think that she could accept the document. She consulted with her supervisor, who agreed.

The tax documents also indicated that Pottabathni earned roughly $7,040 in wages. But, Pottabathni's financial disclosures included with his December 29 submissions revealed that he had about $190,000 in various bank accounts. Yet, Pottabathni owned no stocks, real estate, or vehicles of any kind. Chabot considered these disclosures to be "unusual" and "a red flag."

At this point, the record does not indicate that she notified Pottabathni of the outstanding concerns she had. Chabot still had not received notification that the necessary fingerprints had been received. While waiting for Greenhouse's fingerprints to clear, Chabot worked on other applications. A supervisor testified that investigators were not expected to request additional documentation from

---

[3] Chabot testified that she "reviewed throughout the process . . . popping in and out as often as the process would allow." But, she later testified that in Greenhouse's case, she didn't review documents "until later in the review." On January 5, Chabot responded to an inquiry from Pottabathni by indicating she hadn't yet reviewed his submitted documentation in enough detail to request more information. She again declined to request additional documents in a January 10 e-mail with Pottabathni because she was "still reviewing" Greenhouse and other's applications. She testified that she was aware that Pottabathni's criminal history was still outstanding at that time. She testified she was "still reviewing" on January 14.

applicants until the fingerprints had cleared. Chabot did not claim she could not have notified him about the need for additional documentation.

From December 29 to January 11, Chabot and Pottabathni exchanged numerous e-mails regarding Greenhouse's license application. On December 29, Pottabathni e-mailed Chabot to inquire about his application. Chabot responded that she had received his application and was able to set up an interview for January 14. On January 5, Pottabathni e-mailed Chabot inquiring as to the status of his application, and requesting that she send a copy of the local authority notice to his landlord. Chabot responded the same day saying the LCB does not provide these notices to landlords. She encouraged him to have his landlord contact the local authority directly. She also indicated that she had not yet reviewed his documentation in detail and would get back to him as soon as she had. On January 7, Chabot e-mailed Pottabathni asking for an update on the build out process for his retail location. Pottabathni provided this update that same day.

On January 8, Pottabathni e-mailed Chabot for assistance with submitting an addendum to his lease, and inquired about the status of the local authority notification. Chabot responded on January 10 with instruction for submitting a lease addendum. She also indicated that the notification to local authority had not been sent but indicated that she sent it that day. Chabot testified that any delay related to the local authority notice would not prevent an applicant from moving to the next stage or delay document review.

On January 11, Pottabathni e-mailed inquiring as to the status of his application and indicating he may want to move his application to a new location.

6

On January 14, Chabot called Pottabathni and informed him that Seattle was getting close to its allotment of licenses. She also sent a notification letter informing Greenhouse in writing of this fact. All Seattle applicants were given a similar letter and asked to sign and return it if they wished to move forward with a Seattle application. That same day, she sent Greenhouse's application to "traceability" to ensure that Greenhouse's system functioned properly with the LCB system.

On January 17, Chabot called Pottabathni again and asked if he wanted to continue moving forward with a Seattle license, or try to secure a license in another location. He was unsure how he wanted to proceed and needed to "check with his financiers." He committed to e-mailing back on January 19. On January 19, he e-mailed Chabot indicating that his financiers told him they were not willing to move to another location. This, combined with his commitments to his current location, caused him to decide to proceed with Seattle licensure. Chabot testified that it was "very unusual" for one to be unsure if they wanted to move forward with Seattle licensure right away. She further testified that Pottabathni's frequent need to consult with others before making decision raised concerns for her that he was not the only party in interest, which would require additional documentation.

Also on January 19, Chabot sent a corrected local authority notice to Seattle to correct a mistake in the stated address. She then called the city to ensure there were no further issues with the notice.

On January 20, Greenhouse e-mailed Chabot asking for the application to be moved forward to final inspection. Chabot responded that the application would

be moved forward to supervisory review once all the documents were completed. She e-mailed her supervisor, Frank O'Dell, that day to set up a meeting about the application. Later that day, LCB received the results of the criminal history check from the Washington State Patrol.

On January 25, Chabot requested additional tax information and insurance information, and scheduled a conference call for January 28 with herself, her supervisor, Pottabathni, and his attorney to discuss additional requests.

On January 28, Seattle reached its allotment of licenses. Chabot called Greenhouse to inform it of this, and indicated it would have 30 days to find a new location where licenses were still available. At the time, Greenhouse's application was not ready for final inspection. At least two other applications were ahead of Greenhouse when licensure closed.

Also on January 28, Chabot, her supervisor, Pottabathni, and his attorney met. Chabot outlined the additional documents needed to move Greenhouse's application forward. She sent a formal written request for these documents on January 31.[4] Greenhouse returned this documentation on February 19.

Upon reviewing the additional tax information, the amounts were different than what Greenhouse had initially submitted. Greenhouse subsequently provided a letter from their accountant indicating that they had "made a mistake." Chabot testified that she had never encountered a mistake of that sort in an application before.

---

[4] This request included a request for documents that had previously been requested for another of Greenhouse's applications. The January 31 request included additional documentation specific to the Seattle application.

The LCB then worked unsuccessfully with Greenhouse for over a year to find an alternative location with licenses available to move the application forward. Greenhouse's application was withdrawn on July 3, 2017.

Greenhouse initiated an administrative appeal of the withdrawal. The administrative law judge affirmed the withdrawal. Greenhouse appealed to the LCB. The LCB adjusted some findings of fact from the initial order, but affirmed the withdrawal. Greenhouse petitioned for judicial review with the superior court. The superior court affirmed the LCB's order. Greenhouse moved for reconsideration. The superior court denied the motion.

Greenhouse now appeals to this court.

## DISCUSSION

Greenhouse argues that the LCB did not evaluate his application in a fair and impartial manner because it did not review his submissions in the order they were received. He argues that the LCB's final order affirming the withdrawal of his application failed to appropriately consider critical undisputed facts concerning the order in which submissions were reviewed and is therefore not supported by substantial evidence and is arbitrary and capricious. Greenhouse does not specifically challenge the factual accuracy of any of the LCB's factual findings in his assignments of error. Rather, it "takes issue" with several findings of fact while acknowledging "many of the findings are accurate." It argues that "the placement of facts inaccurately in the chronology of events and the absence of reference to many critical undisputed facts, renders the findings misleading and leaves the conclusions of law without adequate support."

9

Judicial review of the denial of a marijuana license by the LCB is governed by the Washington Administrative Procedure Act, chapter 34.05 RCW (WAPA). Haines-Marchel v. Wash. State Liquor & Cannabis Bd., 1 Wn. App. 2d 712, 727, 406 P.3d 1199 (2017), review denied, 1 Wn. App. 2d 712 (2018), cert. denied, 139 S. Ct. 1383 (2019). When reviewing the final administrative decision, we sit in the same position as the superior court, applying the standards of WAPA directly to the record before the agency. Id. We grant relief from an agency adjudicative proceeding if, inter alia, the order is not supported by substantial evidence or the order is arbitrary or capricious. RCW 34.05.570(3). The party asserting invalidity bears the burden of demonstrating the invalidity of agency action on review. RCW 34.05.570(1)(a). An agency's order is supported by substantial evidence if any fair-minded person could have ruled as the agency had after considering all the evidence. Callecod v. Wash. State Patrol, 84 Wn. App. 663, 676 n.9, 929 P.2d 510 (1997). An agency action is arbitrary and capricious if it is "'willful and unreasoning and taken without regard to attending facts or circumstances.'" Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n, 149 Wn.2d 17, 26, 65 P.3d 319 (2003) (quoting Rios v. Dep't of Labor & Indus., 145 Wn.2d 483, 501, 39 P.3d 961 (2002)). Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious. City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wn.2d 38, 47, 959 P.2d 1091 (1998). Both the "substantial evidence" and "arbitrary and capricious" tests are "highly deferential." ARCO Prods. Co. v. Util. & Transp. Comm'n, 125 Wn.2d 805, 812, 888 P.2d 728 (1995).

10

Greenhouse asserts that the facts are incomplete and misleading because the LCB did not consider critical undisputed facts. In particular, Greenhouse alleges that the LCB failed to consider that other applicants were able to secure review of their documents before Greenhouse, despite submitting these documents after Greenhouse.

But, the LCB did consider these facts. It simply came to a different conclusion as to their import. Greenhouse's core contention is that the LCB's first come first served policy required Chabot to send Greenhouse a request for additional documents as soon as the "red flags" raised by its December 29 submission of documents became apparent. The LCB acknowledged that other applicants were able to secure review of their documents after Greenhouse had submitted its materials. However, it distinguished those applications because they did not have the same "red flags" and "concerns" that slowed Greenhouse's application. While Greenhouse is quick to point out that other applications had concerns or required additional documentation, the record supports that Chabot's concerns with Greenhouse's application were more serious. Chabot testified at length as to the severity of the deficiencies with Greenhouse's December 29 submissions, saying they were "unusual," "very unusual," and that she "never encountered anything like that."

While it may be true that Chabot could have stopped work on other files when she received the December 29 submissions, reviewed them and immediately requested additional information, she was not required to do so. The LCB concluded that the delay in processing the application was reasonable given the

11

concerns and red flags specific to Greenhouse's submission. It further considered Greenhouse's contention that the LCB was required to halt consideration of other applications in order to address the deficiencies with Greenhouses submissions. It concluded that such a policy was not necessary or practical.

We agree that the CPPA does not mandate such conduct under a first come, first served policy. LAWS OF 2015, ch. 70, § 6. It requires only that the LCB adopt a competitive, merit-based application process which reviews applicants in a fair and impartial way. Id. To accomplish this, the LCB instructed its licensing specialists to review documents in the order received. But, if an investigator did not receive all documentation necessary to complete their review, they were permitted to move on to other applications before completing review of the incomplete application.

Such was the case here. Greenhouse's December 29 submission raised red flags that were more serious and unusual than other applications. And, the criminal history report had still not been returned on Greenhouse's principal and financiers. Chabot did not cease work on Greenhouse's file during this time. She engaged in numerous e-mails and telephone communications answering questions and requesting information.

The same day the fingerprints cleared, Chabot set up a meeting with her supervisor about the application. She set up a subsequent meeting with Greenhouse to outline what additional information she would require. Before that meeting occurred, Seattle reached its allotment of licenses. Nevertheless, the LCB

continued to work with Greenhouse for over a year to secure a license in another area.

A fair-minded person could readily conclude that the steps Chabot took were fair and impartial. She responded to concerns and red flags that were more serious than other applications by waiting until she had received all relevant information and promptly setting up a meeting with her supervisor. The LCB considered the facts and attending circumstances surrounding the withdrawal, and concluded the evaluation process was fair and impartial. Though Greenhouse views the facts and comes to a different conclusion, the LCB decision is supported by substantial evidence and is not arbitrary and capricious.

We affirm.

_Appelwick, J._

WE CONCUR:

_____          _Mann, C.J._