[No. 61541-1.   En Banc.   February 9, 1995.]

ARCO PRODUCTS CO., ET AL, *Respondents*, v. THE UTILITIES AND TRANSPORTATION COMMISSION, ET AL, *Appellants*.

*Christine O. Gregoire, Attorney General,* and *Jeffrey D. Goltz, Senior Assistant,* for State.

*Miller, Nash, Wiener, Hager & Carlsen* and *John L. West* and *Beth M. Andrus (Gene C. Rose* and *Yturri, Rose, Burnham, Bentz & Helfrich,* of counsel), for appellant Cascade Natural Gas.

*Donald J. Manning* and *Heller, Ehrman, White & McAuliffe ( Edward A. Finklea, Jacob Tanzer, Paula E. Pyron,* and *Ball, Janik & Novack,* of counsel), for respondents.

UTTER, J. — The Washington Utilities and Transportation Commission and Cascade Natural Gas Corporation appeal the decision of the trial court. The trial court reversed the Commission's decision to approve a formula by which Cascade would pass on, in the form of rate reductions to its present industrial customers, a refund received from Northwest Pipeline Corporation. The refund was made by order of the Federal Energy Regulatory Commission. Under the formula approved by the Commission, Respondents, who are all former industrial customers of Cascade, do not receive a portion of the refund. The trial court ordered the Commission to modify its decision so as to direct Cascade to pay a lump sum to each of the Respondents in the amount of the refund that they would have received in reduced rates had they been current customers. We believe the Commission acted properly on matters within its statutory authority. Therefore, we reverse the trial court and uphold the decision of the Commission.

The Cascade Natural Gas Corporation (Cascade) is a Washington intrastate gas distribution company, commonly called a "local distribution company" (LDC). Northwest Pipeline Corporation (Northwest), an interstate gas pipeline company, is Cascade's upstream gas and transportation provider. Cascade purchases transportation services and some gas supplies from Northwest, and then resells them to its customers in Washington.

As an intrastate gas distribution company, Cascade is subject to regulation by the Washington Utilities and Transportation Commission (Commission or WUTC). The Commission sets the rates that LDC's like Cascade may charge consumers. As an interstate pipeline company, Northwest is subject to regulation by the Federal Energy Regulatory Com-

mission (FERC), which sets the rates that interstate pipelines may charge LDC's.

Respondents ARCO, Intalco, Weyerhaeuser and NORPAC (Respondents) are former industrial customers of Cascade. Cascade and others in the natural gas industry classify their customers as "core customers" and "noncore customers". Core customers are generally the residential, small commercial, and small industrial customers. These core customers are those that purchase "bundled" sales service (gas supplies and all needed transportation services) from the local distribution company. The large industrial customers, such as Respondents, are classified as noncore customers. Noncore customers are those that purchase "unbundled" services (*e.g.*, transportation only).

The last several years have seen a restructuring of the gas industry. In past years, consumers dealt with LDC's, who in turn dealt with the interstate pipelines, who then dealt with the ultimate supplier. Recent FERC orders allowed both LDC's and consumers to purchase gas directly from the supplier, and to purchase "unbundled" transportation-only services from the interstate pipeline. In effect, these changes allowed larger customers to bypass LDC's entirely by purchasing gas directly from suppliers and transportation services directly from the pipelines.

In 1988 and 1989, Respondents took steps to take advantage of the recent regulatory changes that allowed them to bypass Cascade and connect directly to the interstate pipeline. On November 22, 1988, ARCO and Intalco applied to FERC for permission to construct a pipeline enabling them to purchase natural gas directly from a Canadian supplier. Over objections from Cascade and WUTC, FERC granted permission, and the pipeline was completed in September 1990. ARCO and Intalco left the Cascade system on October 1, 1990. On May 9, 1989, Northwest applied to FERC for permission to construct a direct connection from the interstate pipeline to Weyerhaeuser's and NORPAC's industrial plants. Again over Cascade's and WUTC's objections, FERC approved the plan. Weyerhaeuser and NORPAC left the Cas-

cade system on November 1, 1990. WUTC and Cascade appealed the FERC decision to federal court, but the federal court denied their appeal. *Cascade Natural Gas Corp. v. FERC*, 955 F.2d 1412 (10th Cir. 1992).

On January 4, 1988, Northwest filed an application for a rate increase with FERC. FERC allowed Northwest to increase its rates during the pendency of the rate proceeding, subject to a refund of any difference between the interim rate and the final approved rate. The interim rates were allowed to become effective July 3, 1988. In November 1989, FERC approved a final rate lower than the interim rate charged by Northwest since July 1988. On December 21, 1989, Northwest paid $10.9 million to Cascade as the difference between the interim rate and the final rate for all purchases made by Cascade during the interim rate period (July 3, 1988, through November 30, 1989).

Cascade put the refund in an interest-bearing deferral account pending a WUTC order. In November 1991, Cascade filed tariffs with the Commission seeking permission to pass back a portion of the FERC refund to its core customers. The Commission approved Cascade's proposal and $2.3 million of the refund was allocated to be passed on to core customers by means of a prospective rate reduction over a 2-year period. In January 1992, Cascade filed a similar plan to pass back the remainder of the refund to its noncore customers. The proposal was to pass back, to each current noncore customer, the percentage of the total refund equaling the percentage of Cascade's total sales of Northwest supplies and services during the interim rate period attributable to that customer. The amount of the refund was to be passed back as a prospective rate reduction over 2 years or until the amount attributable to a customer had been received by that customer. Any amount remaining after the 2-year period would be divided among all customers. Under this proposal, therefore, former customers such as Respondents would not share in the refund unless they returned to the Cascade system.

Other proposals were put forward by the various parties before the Commission. The Commission staff proposed that

the amount in question be allocated in two parts. The first part, $2.3 million, should be retained by Cascade to cover the cost of the plant that served the bypassing noncore customers (*i.e.*, Respondents). The second part would go only to Cascade's core customers. The public counsel section of the Attorney General's Office recommended the entire amount be allocated to the core customers only. Respondents argued that they should receive a lump sum payment of the portion of the refund attributable to their use during the interim rate period.

The WUTC order, dated December 21, 1992, substantially approved the Cascade proposal. The Commission modified Cascade's proposal by incorporating the Commission staff recommendation that a portion of the refund go toward plant costs associated with the bypassing of former customers. Thus, the Commission ordered that $231,174 go to reduce the undepreciated plant costs, and the remainder be allocated among Cascade's current customers according to the formula proposed by Cascade. The Commission further made findings the rates charged by Cascade during the interim rate period were fair, reasonable, and sufficient and that neither Respondents nor Cascade's other customers had been overcharged during that time.

I

■ ■ Both parties agree that the interpretation of the statutory command that an allocation of a FERC refund be "just and reasonable", as determined by the Commission, is a question of law to be reviewed de novo under the error of law standard. Appellants contend this court should apply that standard with "a heightened degree of deference" since the statute is within the WUTC's "field of expertise". *Inland Empire Distrib. Sys., Inc. v. Utilities & Transp. Comm'n*, 112 Wn.2d 278, 282, 770 P.2d 624, 87 A.L.R.4th 627 (1989). This deference to an agency's interpretation of a statute will be given only when the statute is ambiguous. *Waste Mgt. of Seattle, Inc. v. Utilities & Transp. Comm'n*, 123 Wn.2d 621, 628, 869 P.2d 1034 (1994) ("Absent ambiguity . . . there is no need for the agency's expertise in construing the statute.").

RCW 80.28.200 gives the Commission a great deal of discretion to determine whether a FERC refund is to be allocated or partially allocated to the LDC's customers, and if so, how it is to be allocated. The statute provides:

> Whenever any gas company whose rates are subject to the jurisdiction of the commission shall receive any refund of amounts charged and collected from it on account of natural gas purchased by it, by reason of any reduction of rates or disallowance of an increase in rates of the seller of such natural gas pursuant to an order of the [FERC] . . . the commission shall have power . . . to determine whether or not such refund should be passed on, in whole or in part, to the consumers of such company and to order such company to pass such refund on to its consumers, in the manner and to the extent determined just and reasonable by the commission.

RCW 80.28.200.

The statute unambiguously gives the WUTC the authority and discretion to determine whether and how to allocate the refund. The only ambiguity in this statute is the meaning of the phrase "in the manner and to the extent determined just and reasonable by the commission".

The phrase "just and reasonable" is open to a number of different interpretations. Philosophers have attempted to define "justice" for centuries. The term "reasonable" is equally difficult. Moreover, the meaning of "just and reasonable" can vary according to the context. What is just and reasonable in a highly regulated industry such as natural gas may be very different from what is just and reasonable in a different business context. Because the phrase "just and reasonable" is ambiguous, and the Commission has a special expertise in the area of regulated utilities, we give a great deal of deference to its determination of what is "just and reasonable".

Most importantly, the statute does not simply use the phrase to put an objective limitation on the Commission's discretion. The statute does *not* say: "The commission's determination must be just and reasonable." Instead, it says that if a refund is to be passed on to the company's consumers, it should be done so "in the manner and to the extent determined just and reasonable *by the commission*." (Italics ours.) RCW 80.28.200. Thus, the statute itself clearly states who is

to determine what is "just and reasonable" — it is the Commission, not the courts. For this reason also, we defer to the WUTC's determination of whether the allocation of the refund is "just and reasonable".

The standard of review is therefore determined solely by the Administrative Procedure Act (APA), RCW 34.05.570(3), which states: "The court shall grant relief from an agency order in an adjudicative proceeding only if it determines that: . . . (e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, . . . or (i) The order is arbitrary or capricious."

## II

■ Both the "substantial evidence" and the "arbitrary and capricious" standards are highly deferential. As we have stated previously, "[w]e will not set aside a discretionary decision absent a clear showing of abuse."[1] *Jensen v. Department of Ecology*, 102 Wn.2d 109, 113, 685 P.2d 1068 (1984). The evidence in the record regarding the burdens, the responsibility for which Respondents avoided by leaving the Cascade system, is enough to constitute substantial evidence upon which the Commission could have decided that it is just and reasonable that they should not share in the benefit of the refund allocation. Similarly, the distinction between current customers and former customers is enough to support the Commission's order under the arbitrary and capricious standard.

## A

■ Contrary to Respondents' assertions, they do not have a property right to any portion of the refund. Nor did Respondents have a reasonable expectation that they would receive a partial refund of the rates they paid to Cascade during the interim rate period.

Respondents did not know whether there would be a refund from Northwest to Cascade at all. FERC could very well have

---

[1]These are all articulations of what is essentially the same deferential standard of review. If there is not substantial evidence upon which to base a decision, then it is arbitrary and capricious — and the agency has abused its discretion in exercising it in such a manner.

set rates at the interim rate, resulting in no refund to Cascade. In that case, Respondents obviously would not be entitled to any allocation of the refund because there would be no refund to allocate.

Similarly, the Commission could have issued an order that did not pass on any of the refund. RCW 80.28.200 clearly states "the commission shall have the power . . . to determine *whether or not* such refund should be passed on, *in whole or in part*, to the consumers of such company". (Italics ours.)

Finally, the rates paid by Cascade's customers during the interim period were found to be "fair, just, and reasonable" by the Commission. Admin. R., at 576. These rates were set in June 1987, a full year before Northwest raised the rates charged to Cascade. Cascade did not respond to this rate increase by simply passing through to its customers the higher Northwest interim rates.[2] Instead, Cascade continued to charge a rate that was "fair, just, and reasonable". Respondents, therefore, cannot claim that they were "overcharged" during the interim rate period.[3] Because these rates charged during the interim rate period were "fair, just, and reasonable", Respondents do not have a right to a refund of any portion of those rates they paid.

Confusion resulted in the trial court's acceptance of Respondents' assertion of a property right. It is apparently the result of the fact that the formula used to calculate the amounts of the refund to be allocated to Cascade's current customers

---

[2]Cascade did pass through one small portion of the Northwest rate increase to its noncore customers. Admin. R., at 576. This "commodity portion" of the interim transportation rate, however, amounts to only 16 percent of the FERC refund. Admin. R., at 647.

[3]In fact, the rates set in 1987 for Respondents and Cascade's other large industrial (or noncore) customers during the interim rate period included a discount from the benchmark rate, while the rates charged to Cascade's core customers included a surcharge over the benchmark. The core customers were essentially subsidizing the rates paid by Respondents and the other noncore customers so that Cascade could be more competitive among suppliers to large industrial customers. Admin. R., at 576. Even if Cascade had passed through the entire amount of the Northwest interim rate increase to their customers, however, the result of this case would be the same.

refers back to a period when Respondents were still doing business with Cascade. It is important, however, not to confuse what amounts to two separate issues. Cascade's formula is a separate issue from the real issue of whether the statute requires that Respondents be entitled to share in the allocation at all.[4] The fact that the formula used to allocate the refund among the current customers refers to a period when Respondents were still customers should not cloud the issue.

None of Cascade's customers had a right to any portion of the refund unless and until the Commission said they did. Further, the extent of any such right that the customers may be granted is determined by the scope of the Commission's order.

## B

Under the APA, there must be substantial evidence in the record to support the Commission's finding that the challenged method of allocation was just and reasonable, and the order may not be arbitrary and capricious. It should be pointed out that the evidence need not support the contention that the approved method is the *most* just and reasonable. It may very well be that the method proposed by Respondents, and rejected by the Commission, is just and reasonable. There may in fact be many different methods that would meet this standard. We need only decide, however, whether the record can support the Commission's determination that the approved method is one of these.

Appellants assert there are a number of liabilities Cascade will incur in the future as a direct result of events that occurred in the past, at a time when Respondents were still customers. Br. of Appellant (Cascade), at 21, 26-28; Br. of Appellant (WUTC), at 37-39. Substantial evidence exists in the record to support this assertion. See, *e.g.*, Admin. R., at 658-59 (Stoltz testimony), 799-801 (Thomas testimony), 932 (Lazar testimony). Respondents, however, will not be respon-

---

[4]Respondents do not challenge the formula proposed by Cascade to calculate the amount that each customer is to be allocated from the refund. Instead, they argue that they should be awarded the amount that they would have received under the formula had they been current customers.

sible for any of these liabilities that manifest themselves after Respondents left Cascade. Based on this evidence, the Commission could have concluded it is just and reasonable that gains be treated the same as liabilities and that Respondents, therefore, should not benefit from a gain, traceable to a past occurrence, realized after they leave.[5]

If the Commission approves a plan by which a refund is not passed on to the company's customers at all, that refund would presumably go into the company's surplus. In practice, such funds would be likely to alleviate the need, at least temporarily, for a rate increase. By delaying the next rate increase, the refund, resulting from past overpayments, is in effect being passed on to current customers by allowing them to temporarily avoid higher rates. If the practical effect of following both the letter and the spirit of the statute is that a refund may ultimately benefit only current customers, the Commission certainly could have concluded that it is "just and reasonable" to reach the same result in a more direct and up-front manner.

## C

Respondents argue that the provisions of RCW 80.28.090 and .100 put a further limitation on the discretion of the Commission to determine the allocation of a FERC refund.

---

[5]This result reflects the commonsense rule that expenses and savings are passed along to customers when they are realized. Businesses do not normally try to determine the point of origination of the expense or saving, and then track down the customers that existed at that time. For example, if a merchant incurs a large liability as a result of a lawsuit that arose from an accident on its premises several years earlier, the merchant would not try to charge extra those who made purchases the day of the accident. The expense would instead be passed along to the merchant's current customers. Similarly, Respondents' claims remind one of a situation where a customer purchases an item from that merchant, only to discover at some future date that the price of the item has subsequently dropped. Absent an explicit price guarantee, that customer is not entitled to recover the difference from the merchant as a matter of right — not even if the fall in prices was attributable to a refund that the merchant received from its supplier for an earlier overcharge of that very item the customer purchased. It is reasonable for the Commission to approve a plan that accomplishes what would essentially occur in an unregulated business enterprise.

■ RCW 80.28.090 provides:

> No gas company . . . shall make or grant any *undue or un-reasonable* preference or advantage to any person, corporation, or locality, or to any particular description of service in any respect whatsoever, or subject any particular person, corporation or locality or any particular description of service to any *undue or unreasonable* prejudice or disadvantage in any respect whatsoever.

(Italics ours.) This section does not limit the Commission's discretion more with respect to the allocation of a refund than does the "just and reasonable" language of RCW 80.28.200. If the allocation of the refund was done in a way that is just and reasonable, then the prejudice suffered by the Respondents and/or the advantage enjoyed by Cascade's other customers would not be "undue or unreasonable". The language used is substantially similar. RCW 80.28.090 is a general provision that applies to all business dealings of the utility while RCW 80.28.200 applies only to FERC refunds.

RCW 80.28.100 provides:

> No gas company . . . shall, directly or indirectly, or by any special rate, rebate, drawback or other device or method, charge, demand, collect or receive from any person or corporation a greater or less compensation for gas . . . or for any service rendered or to be rendered, or in connection therewith, except as authorized in this chapter, than it charges, demands, collects or receives from any other person or corporation for doing a like or contemporaneous service with respect thereto under the same or substantially similar circumstances or conditions.

This section puts a more absolute limit on the Commission's discretionary authority to set rates. However, it contains the clause "except as authorized in this chapter". Since RCW 80.28.200 specifically authorizes the Commission to allocate a FERC refund in any way that it determines to be "just and reasonable", that authorization necessarily takes FERC refund allocation outside the scope of this section.

Moreover, even if these sections did apply to FERC refund allocations and did provide greater limitations on the Commission's discretion, the Respondents in this case lack standing to assert a violation of these sections. When Respondents were Cascade customers (*i.e.*, during the interim rate period), each of Cascade's customers were charged the same

rate. Thus, no discrimination took place and Respondents suffered no prejudice during that period. If there is unfair prejudice occurring, it is the advantage that Cascade's current customers who were customers during the interim rate period are receiving over the current customers who have joined or will join Cascade since that time. That, however, is a problem with Cascade's current rates, and as former customers, Respondents do not have standing to object to Cascade's current rate structure.

Upholding the trial court's ruling would limit the discretion of the Commission in contravention of the plain meaning of RCW 80.28.200. The trial court apparently accepted Respondents' characterization of the refund as the "property" of the customers who made purchases during the interim rate period. Under this circular reasoning, the allocation of any FERC refund would be mandatory and it would require that those customers, and only those customers, who made purchases during the interim rate period would be allocated a proportionate share. The trial court's opinion thus establishes a strict rule as to how FERC refunds are to be handled. As Respondents admit, under the trial court's reasoning "there is no discretion remaining for the WUTC to exercise. There are no gaps to be filled in order for a proper legal determination to be made." Br. of Resp'ts, at 44. Such a result flies in the face of the statute which clearly gives the Commission broad discretion in determining how, or if, such refunds should be allocated.

Respondents made an informed business decision to buy gas from Cascade during the interim rate period. The price they paid was determined to be fair and reasonable at the time. They had no reasonable expectation then they would receive any refund of that amount. Respondents subsequently made an informed business decision to stop doing business with Cascade. They now must accept the consequences of those decisions. The method of allocation approved by the WUTC was not arbitrary and capricious and it was supported by substantial evidence. We, therefore, reverse the trial court and uphold the Commission's decision

regarding the method by which Cascade is to pass along the refund to its present customers.

DURHAM, C.J., DOLLIVER, SMITH, GUY, JOHNSON, and MADSEN, JJ., and ANDERSEN and BRACHTENBACH, JJ. Pro Tem., concur.

Reconsideration denied May 4, 1995.