IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| SOUND ACTION, a Washington non-profit corporation, | No. 86228-6-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| KING COUNTY, a political subdivision of the State of Washington, and MIKE SPRANGER, Applicant, | |
| Respondents. | |

DÍAZ, J. — King County (County) approved Mike Spranger's shoreline substantial development permit (SSDP) application for an aquaculture farm off the coast of Vashon Island. The County also issued a mitigated determination of nonsignificance (MDNS) under the State Environmental Policy Act (SEPA), chapter 43.21C RCW and chapter 197-11 WAC. The Shorelines Hearings Board (Board) upheld the County's decisions. Sound Action now argues the Board disregarded procedural failures of the County's review process, as well as substantive evidence of the project's risk to whales and macroalgae. In well over a dozen assignments of error, addressing nearly two dozen findings of fact, Sound Action claims the Board's decision was unsupported by substantial evidence, contrary to the law, or arbitrary and capricious. We disagree and affirm the Board.

## I.    BACKGROUND[1]

In June 2022, the County received an SSDP application from Spranger. Spranger proposed a kelp and shellfish farm approximately 300 feet off the coast of Vashon Island.

On August 11, 2022, the County issued a combined notice of application (NOA) and "SEPA Notice Optional DNS/MDNS Process."  This document stated the "responsible official has a reasonable basis for expecting to issue a SEPA Determination of Non-Significance" and that there was a 33-day public comment period slated to end on September 13, 2022.  Undisputed testimony later established the County nonetheless accepted public comments until it issued its ultimate SSDP and MDNS decisions in January 2023.

Sound Action submitted a public comment primarily alleging the project would shade macroalgae and create entanglement risks for whales.  Sound Action also alleged procedural issues with the County's review process, namely that "important information is missing from the project details and environmental evaluation."  In response to these and other comments, the County requested and Spranger provided additional information on the project.

---

[1] The Administrative Procedure Act (APA), chapter 34.05 RCW, "governs judicial review of agency actions, including the Shorelines Hearings Board's decisions.". Herman v. Shorelines Hr'gs Bd., 149 Wn. App. 444, 457, 204 P.3d 928 (2009). The APA requires that we view the record in a "light most favorable to . . . the party who prevailed in the highest administrative forum that exercised fact-finding authority."  Alpha Kappa Lambda Fraternity v. Wash. State Univ., 152 Wn. App. 401, 418, 216 P.3d 451 (2009).  Here, the County and Spranger prevailed before the Board.  Further, unchallenged findings of fact are verities on appeal.  Edelman v. State, 160 Wn. App. 294, 303, 248 P.3d 581 (2011).  We utilize both principles in presenting the foregoing facts.

In January 2023, the County issued its SSDP Report and Decision.[2]  The SSDP authorized a 9.6 acre site, 6.6 acres of which is farmable and comprised of six anchors and three line arrays.

The County also issued a SEPA threshold MDNS, finding "the proposal does not pose a probable significant adverse impact to the environment, provided the mitigated measures are applied."  These mitigations included monitoring requirements, a requirement to stop in-water activities if marine mammals are present, and the development of an "entanglement response plan."

Sound Action petitioned the Board for review of the SSDP and MDNS.  Sound Action first alleged the County violated SEPA by failing to "obtain reasonably sufficient information to evaluate" the project and its effect on whales and macroalgae.  Sound Action also alleged the County violated the King County Code (KCC) and the County's Shoreline Master Program (SMP).

In May 2023, the Board held a seven-day evidentiary hearing.  In August 2023, the Board largely upheld the SSDP and MDNS in a lengthy decision, comprised of 100 findings of fact and 35 conclusions of law.  However, the Board found the County did "not specify a deadline . . . for Spranger to submit a marine mammal entanglement response plan" and ordered the County to set a deadline before any lines were placed.

Sound Action petitioned the superior court for review of the Board's

---

[2] Prior to the County's decision, it had also received evidence that various federal, state, and tribal entities approved of, or otherwise supported, the project, including the Washington Department of Ecology and Department of Fish and Wildlife, the Puyallup and Snoqualmie Tribes, the National Marine Fisheries Service, U.S. Fish and Wildlife Service, and the U.S. Army Corps of Engineers.

decision. Sound Action then successfully moved the superior court to certify the matter for direct review before this court.

## II. ANALYSIS

### A. Principles Guiding Our Review

#### 1. SEPA

"The legislature enacted SEPA in 1971 to inject environmental consciousness into governmental decision-making." Columbia Riverkeeper v. Port of Vancouver USA, 188 Wn.2d 80, 91, 392 P.3d 1025 (2017). SEPA requires "'environmental amenities and values be given appropriate consideration in decision making along with economic and technical considerations.'"[3] Anderson v. Pierce County, 86 Wn. App. 290, 300, 936 P.2d 432 (1997) (quoting Stempel v. Dep't of Water Res., 82 Wn.2d 109, 118, 508 P.2d 166 (1973)); RCW 43.21C.030(b).

SEPA states a "local government . . . must make a 'threshold determination' of whether the project is a 'major action significantly affecting the quality of the environment.'" Anderson, 86 Wn. App. at 300-01 (quoting RCW 43.21C.030(2)(c)). "At the end of the threshold phase, the agency issues one of three determinations: a determination of nonsignificance (DNS), a mitigated determination of nonsignificance (MDNS) (if the proposal will not have probable significant environmental impacts or if those impacts will be mitigated), or a

---

[3] More specifically, "the goals of SEPA are to (1) create harmony between people and the environment, (2) prevent damage to the environment, (3) stimulate the health and welfare of humans, and (4) enrich understanding of natural resources and systems." King County v. Friends of Sammamish Valley, 3 Wn.3d 793, 814, 556 P.3d 132 (2024) (citing RCW 43.21C.010).

determination of significance (DS)" and an "[Environmental Impact Statement (EIS)] is mandatory following a DS." Chuckanut Conservancy v. Dep't of Nat. Res., 156 Wn. App. 274, 286, 232 P.3d 1154 (2010). Even without an EIS, the MDNS process and resulting "environmental studies and analysis may be quite comprehensive." Anderson, 86 Wn. App. at 301. Here, the County issued an MDNS.

2. APA

The APA governs our review of the Board's decision. Preserve Our Islands v. Shorelines Hr'gs Bd., 133 Wn. App. 503, 514-15, 137 P.3d 31 (2006) (citing chapter 34.05 RCW). The party asserting invalidity bears the burden of demonstrating invalidity, here Sound Action. Id. at 515; RCW 34.05.570(1)(a). Under RCW 34.05.570(3)(d), (e), and (i), Sound Action claims the Board's decision is not supported by substantial evidence, erroneously interpreted or applied the law, and is arbitrary and capricious.

We address each in turn.

B.    Alleged Errors Related to a Lack of Substantial Evidence

For substantial evidence claims, this court gauges whether the court's findings of fact are supported by evidence "sufficient to persuade a fair-minded person of the declared premise" and overturns only "clearly erroneous" findings. DaVita, Inc. v. Dep't of Health, 137 Wn. App. 174, 181, 151 P.3d 1095 (2007). The "substantial evidence standard, like the arbitrary and capricious standard, is 'highly deferential' to the agency fact finder." Alpha Kappa Lambda Fraternity v. Wash. State Univ., 152 Wn. App. 401, 418, 216 P.3d 451 (2009) (quoting ARCO Prods. Co. v. Utils. & Transp. Comm'n, 125 Wn.2d 805, 812, 888 P.2d 728 (1995)). Thus,

the "[e]vidence will be viewed in the light most favorable to . . . the party who prevailed in the highest administrative forum that exercised fact-finding authority," here the County and Spranger. Id.

We do not reweigh the evidence or reassess witness credibility. Richardson v. Dep't of Labor & Indus., 6 Wn. App. 2d 896, 908, 432 P.3d 841 (2018) (reweigh); Whidbey Envtl. Action Network v. Growth Mgmt. Hr'gs Bd., 14 Wn. App. 2d 514, 526, 471 P.3d 960 (2020) (credibility). In turn, we must "accept the fact finder's determinations of witness credibility and the weight to be given reasonable but competing inferences." Alpha Kappa Lambda, 152 Wn. App. at 418. Thus, an appellant's mere assertion of some evidence that "may support an inconsistent conclusion" alone does not "'prevent an administrative agency's finding from being supported by substantial evidence.'" Bowers v. Pollution Control Hr'gs Bd., 103 Wn. App. 587, 602 n.15, 13 P.3d 1076 (2000) (quoting Aviation W. Corp. v. Dep't of Labor & Indus., 138 Wn.2d 413, 429, 980 P.2d 701 (1999)).

Sound Action's challenges to the sufficiency of the findings of fact fit within three overarching categories: those related to (a) the County's review process, (b) the risk to whales, and (c) the risk to macroalgae. We address each of these categories in turn below.

Sound Action also appears to challenge many conclusions of law as if they were findings of fact. As acknowledged by the Board, a finding of fact more properly labeled as a conclusion of law may be treated as a finding of fact. Ives v. Ramsden, 142 Wn. App. 369, 395 n.11, 174 P.3d 1231 (2008).

We have thoroughly reviewed both the record and Sound Action's arguments. As will be discussed further below, we conclude the Board's decision

affirming the SSDP and MDNS is "supported by evidence that is substantial when viewed in light of the whole record before the court." RCW 34.05.570(3)(e).

1. The County's Review Process

a. Pre-Application Review

Sound Action first challenges the Board's finding of fact 11 that the County "conducted a preliminary review of the Project during the pre-application process that began in October 2021" and that the County "assigned staff to conduct the pre-application review in March 2022." While Sound Action acknowledges Spranger submitted pre-application materials in October 2021, it nonetheless argues the "County was still determining when it could begin review as of June 24, 2022," summarily citing Spranger's testimony and an email written by King County staff. Viewing the evidence as we must, we disagree that substantial evidence does not support the Board's findings.

Spranger testified that King County staff reached out to him in March 2022 and that they had a "number of conversations . . . over the subsequent weeks during that preconference review," a process which County staffers also had separately explained. Sound Action also takes an overly narrow view of a County email that states the "soonest we can begin reviews on these will be the end of August." This email could reasonably be interpreted to convey the timeline for some, but not all, County staff, some of which had previously engaged with him. With the above, a reasonable person could believe that the County had begun and staffed a process as early as October 2021 and well prior to March 2022.

We hold Sound Action failed to establish this finding is "clearly erroneous" or that the administrative record was insufficient to persuade a fair-minded person

of the declared premise.  DaVita, 137 Wn. App. at 181.

           b.  Application Review

Sound Action next challenges numerous findings that address the information available to the County when it reviewed the application materials. First, it challenges finding of fact 15 that "[p]ublic comments were received and reviewed by King County and the applicant."  Sound Action acknowledges the County's receipt of public comments, but nonetheless argues there is "*no* evidence that County staff reviewed public comments." (Emphasis added.)  We disagree.

The Board heard testimony from Ty Peterson who serves as the "commercial product line manager for Permitting."  This position made Peterson the "final decision-maker on the shoreline permit."  Peterson testified that review of public comments is "part of our process" and "built into our timelines" to ensure that "every comment is . . . read and considered by our staff."  Consistent with this testimony, the SSDP itself states "[a]ll public comments received were shared with the applicant and the County review staff" and "thoroughly evaluated."

Further, WAC 197-11-355(4) requires only the "responsible official shall consider timely comments," here Peterson.  Thus, Elizabeth Greene's[4] testimony that "the public comments weren't that germane to [her] review" is inapposite, even assuming arguendo it establishes she never reviewed the comments.  Regardless, Greene also testified she "reviewed" and "consider[ed]" the public comments.  In this context, Greene's statement that the public comments were not that "germane"

---

[4] The County retained Elizabeth Greene, a consultant and biologist from Anchor QEA, to review Spranger's proposal.  Washington's Department of Natural Resources and Parks (DNRP) assigned two environmental scientists to review Greene's work.

could be interpreted by a fair-minded person to mean the comments did not alter her final conclusions or recommendations.

Next, Sound Action challenges two findings relating to the County's consideration of the project's specifications. First, the Board stated in finding of fact 31 that the SSDP "is limited to installing six anchors, which can support a total of three arrays of grow lines." Second, the Board stated in finding of fact 32 that "[c]onsistent with the text of the [SSDP] . . . Spranger explained his understanding that the [permit] authorizes three arrays with a total of up to 15 lines" and that he would need further approval for any additional arrays or lines. Id. Sound Action argues the above findings are inaccurate as the "[SSDP] does not identify the number of lines . . . and none of the conditions limit the farm to three spreader bars with fifteen lines." We disagree.

Sound Action mischaracterizes the Board's findings. The Board did not state that the SSDP allows only 15 lines, but that Spranger's *understanding* is consistent with the permit (i.e., three arrays). Further, Spranger's testimony acknowledged he would need additional approval to go beyond the description within the SSDP. A reasonable person could interpret the above evidence to support the Board's finding that Spranger's understanding is consistent with the SSDP.

Finally, Sound Action challenges conclusion of law 17; it claims the "Board did not cite evidence for finding that County has 'experience with similar types of projects and equipment'" as "[o]nly one other aquaculture facility had been proposed in King County, and it did not complete review." We disagree.

The Board's conclusion cites numerous findings including unchallenged

9

finding of fact 19, which cites Peterson's testimony that the County determined "the Project—which uses a series of anchors, lines, and buoys—would not use methods or technologies that are unprecedented or unproven in the state of Washington." This and other unchallenged findings are verities on appeal. Edelman v. State, 160 Wn. App. 294, 303, 248 P.3d 581 (2011). Further, Peterson testified that "quite a bit of review had been done" before the withdrawal of the other aquaculture project referenced by Sound Action. Thus, it is inaccurate to claim there is *no* evidence to support the Board's conclusion that the County has experience with similar projects.

In sum, we hold that Sound Action failed to establish the Board's challenged findings on the County's application review process were "clearly erroneous" or that the administrative record is insufficient to persuade a fair-minded person of the declared premise. DaVita, 137 Wn. App. at 181.

2. The Project's Risk to Whales

Sound Action next avers that many of the Board's findings of fact and conclusions of law regarding the project's risk to local whales disregarded certain evidence or were otherwise unsupported.

a. Whale Attraction and Mitigation Measures

The Board's finding of fact 80 states "the record does not show that the Project site is likely to attract whales or that they will lose a significant foraging area" for "kelping"[5] activities. Sound Action argues that its "two experts with experience studying the behavior of whales in the wild," Dr. David Bain and Monika

---

[5] "Kelping" consists of whales physically interacting with or traversing through kelp.

Wieland Shields, testified otherwise. From this, it then argues the "Board arbitrarily relied on [Dr. Thomas] Gornall, a small [animal] veterinarian without experience with whales in the wild," for its decision.

Sound Action first ignores the Board's related finding that it was persuaded by Chris Cziesla's contrary testimony.[6] Specifically, Cziesla discussed the project site's lack of prey accumulation compared to surrounding areas, particularly when considering the site's small size relative to the Colvos Passage as a whole, and how the sugar kelp to be grown at the project site is distinguishable from bull kelp which forms canopies that attract whales.[7] That is, in contrast to low prey aggregations near the project area, "areas near Tacoma Narrows to the south and the mouth of the Puyallup River to the east" feature much larger prey concentrations. We may not reweigh the evidence or assess credibility. Whidbey Envtl., 14 Wn. App. 2d at 526. With this evidence and under this standard of review, the Board had sufficient evidence to find as it did, regardless of Dr. Gornall's credentials or his testimony on "kelping."

Regardless of whether whales will be attracted to the area, the Board's conclusion of law 19 stated the "mitigation measures imposed in the MDNS" included "avoiding in water-activities if marine mammals are present." Sound Action argues the SSDP "approve[d] a perennial longline marine aquaculture facility that will remain in the water when whales are present, and thus cannot avoid

---

[6] Chris Cziesla has a background in marine biology and worked for the Confluence consulting firm retained by Spranger.

[7] As established in the Board's unchallenged finding of fact 2, the "site measures approximately 1,200 feet by 3,500 feet, for a total of 9.6 acres," approximately 0.1% of the "Colvos Passage [which] is approximately 9,819.97 acres."

11

in-water activities."

> Sound Action's argument refers to the MDNS mitigation condition that:

> Prior to installation of farming infrastructure, operators *will survey* for Southern Resident Killer Whales (SRKW), humpback whales and other marine mammals (and consult with the ORCA Network) and *avoid in-water activities* if any are within, or anticipated to be in, the project area. Similarly, operators will not conduct farm maintenance activities or harvest if SRKW or humpback whales are within or are anticipated to enter the project area. Please post signs in the vessels reminding operators to stay a minimum of 200 yards away from marine mammals at all times.

(Emphasis added.) Sound Action's argument takes an overly expansive view of the above condition. Contrary to Sound Action's argument, the condition does not purport to or intend to prevent *all* in-water activities or risks the farm's structure itself poses to its surroundings. Rather, the condition specifically aims at farm workers' conduct. Namely, the condition requires farm workers "survey" for marine animals and "avoid in-water activities if any are within, or anticipated to be in, the project area." That is, the condition sets a procedure for farm workers to follow before and while engaging only in *their* in-water activities, such as the installation or maintenance of equipment.

Thus, a reasonable person could conclude that the Board's finding related to workers' in-water activities is based on substantial evidence. DaVita, 137 Wn. App. at 181.

### b. Data on Whale Sightings and Entanglements

Challenged finding of fact 59 discusses the testimony of Amy Carey, Sound Action's executive director, and Alisa Brooks, a coordinator for the "Orca Network," which compiles whale sightings in Puget Sound. Challenged finding of fact 73 then discusses why the Board rejected Carey's and Brooks' testimony in favor of

Cziesla's testimony on whale sighting data.

Sound Action argues that neither Spranger nor the County "offered evidence to rebut Carey's observations other than testimony that Spranger had not observed whales there." Sound Action contrasts this testimony with Spranger's, which it claims is vague and undermined in part by his admission that "it was possible [whales] had been there" and that "he is often doing other things" during his visits. We disagree.

The Board explained at length why it rejected Carey's and Brooks' evidence. As to Carey's photos, videos, and observations, it explained that her generalized descriptions were insufficient to establish the actual locations of the whales in relation to the project site. The Board further credited Cziesla's testimony, who stated Sound Action's "opportunistic" data was unreliable due to sampling bias. For example, he asserted Sound Action's data was biased by some locations uniquely having overlooks, viewpoints, or ferry routes.

Additionally, Cziesla contrasted Sound Action's proffered data with that of a 2018 study of SRKW sightings from 1976 to 2014. The 2018 study included the project area in the "lowest group of sighting frequencies."[8] In other words, a reasonable person could believe the above evidence from Cziesla was more reliable than that offered by Carey and Brooks.

Sound Action also challenges conclusion of law 26 which states "[n]o evidence was presented that whales have ever become entangled in similar kelp

---

[8] Even if we were to consider just his testimony, in fact, Spranger testified he had visited the project site at least 200 to 250 times and that he had never "personally seen [whales] in [the] Colvos [Passage]."

13

cultivation equipment." (Emphasis added.) Specifically, the Board concluded entanglements have been reported in facilities with "slack to form loops" but not in "taut lines" as proposed here. The Board also concluded SRKW and Biggs' killer whales can echolocate to avoid structures.

Sound Action claims other evidence undermines the above conclusions. First, it cites to Shields' testimony that orcas are "not always echolocating" and thus could not always be expected to avoid the project site. Second, it cites Shields' testimony that there would "still be a significant risk of entanglement for the whales we've discussed today even if the lines were taut." Third, it cites to Dr. Bain's testimony reiterating Shields' testimony on echolocation.[9] This argument is unavailing because it again ignores additional testimony before the Board.

Dr. Gornall testified extensively about killer whales' echolocation. Dr. Gornall also agreed that there have been no reported orca entanglements in "similarly situated farms" growing kelp, which he acknowledged is corroborated by the World Wildlife Fund's comment that there have been no credible reports of marine entanglements in kelp farms for over 40 years. Despite Shields' and Dr. Bain's testimony, a reasonable person could choose to rely on Dr. Gornall's testimony. In turn, we hold Sound Action failed to establish the Board's challenged findings on whale sighting and entanglement data were "clearly erroneous" or that

---

[9] Sound Action also cites to a National Oceanic and Atmospheric Agency (NOAA) Fisheries article from 2022, which is inapposite. The article states that an orca was entangled near Oregon in "what was most likely recreational crab gear" as well as past entanglements in "fishing gear." In other words, the article appears to address equipment distinct from the project challenged on appeal. Indeed, Shields generally testified that there are "examples" of orcas being entangled in "different types of lines," but appears to specifically cite the above Oregon example.

the administrative record is insufficient to persuade a fair-minded person of the declared premise. DaVita, 137 Wn. App. at 181.

c.  National Marine Fisheries Service (NMFS) Letter

Sound Action claims there are numerous problems with the Board's reliance on a NMFS concurrence letter in findings of fact 5, 26, 85, and 88, as well as conclusion of law 19.  In short, it claims "flagrant deficiencies in NMFS' project review," a failure to "acknowledge the risk that whales would engage in kelping," and a failure to discuss whether the lack of reported entanglement cases is attributable to a lack of longline aquaculture facilities.   Having already discussed entanglement and attraction risks above, we turn to the basis of the Board's reliance on the NMFS letter.

Sound Action alleges both its witnesses and the County's witnesses testified that NMFS has a "reputation for underestimating project impacts and risk." For example, it cites to Dr. Bain's testimony that NMFS is "behind the curve" compared to Washington regulations and other state/federal agencies.  Further, Greene testified that she has "heard of" instances where NMFS has not used the "best available science."  Sound Action also points to a County employee's email generally stating federal agencies "rarely do a great job" in evaluating projects.  We disagree.

Sound Action's cited comments should be read in context.  Dr. Bain expressed generalized concerns regarding NMFS on other past projects with minimal, if any, discussion of the present proposal.  While Greene states she's "heard of" methodology issues with NMFS, she testified that she has not seen them "firsthand."  The November 2022 County employee's email expressed an even

more generalized opinion on various federal entities combined and did so *before* NMFS even issued its concurrence letter in January 2023. Further, it is Peterson, not the quoted County staff, who serves as the "final decision-maker on the shoreline permit."

Sound Action also claims that the NMFS letter "does not distinguish between the entanglement risk posed by the kelp aquaculture gear and other aquaculture gear" and further cites to a National Oceanic and Atmospheric Administration (NOAA) article that purportedly shows the extreme entanglement risk of "fixed fishery gear" and "anchoring in buoys lines."

Sound Action's argument presents an overly narrow view of NMFS' discussion of entanglements data, which explains that only 19 "entanglements within aquaculture gear" had occurred globally since 1982. Further, "these examples were associated with offshore shellfish aquaculture operations in deep water habitat," as opposed to the present proposal's "shallow draft of floating gear." Additionally, NMFS contrasted this data with that for "fishery gear" in which entanglements number "in the hundreds of thousands."

Finally, Sound Action's cited NOAA article specifically discusses "fishery gear," and *distinguishes* aquaculture gear from fisheries gear. For example, the article does indeed state "anchoring and buoy lines" present a risk, but "are *not* likely to impose *entanglement* risk" and instead "pose more risk to the animals from collisions resulting in lacerations" or "bruising." (Emphasis added.) In fact, the article appears to distinguish the lines from "high tension, metal cables as anchoring systems" by arguing further studies of the latter "could yield insight into how protected species are affected by the structures."

16

Thus, when all this evidence is read in its entirety in the way we must, we hold Sound Action failed to establish the Board's challenged findings relating to the NMFS letter were "clearly erroneous" or that the administrative record is insufficient to persuade a fair-minded person of the declared premise. DaVita, 137 Wn. App. at 181.

3. The Project's Risk to Macroalgae

Sound Action next argues the Board's findings of fact regarding the project's risk to local macroalgae disregarded evidence or were unsupported.

a. Underlying Macroalgae Data

Sound Action first challenges the Board's finding of fact 34 that the SSDP "noted a map of existing kelp relative to the proposed farm." It argues that the referenced map does not actually depict kelp conditions around the project site.

Sound Action may be correct that there is no map showing *both* the project site directly alongside kelp conditions. However, the record contains a project site map immediately followed by descriptions of macroalgae/kelp conditions nearby. The latter document describes how some macroalgae was observed only around the two shallowest anchor sites, but not the remaining four anchor sites at deeper locations. And Peterson testified the County utilized this map. Taken together, there is a reasonable basis to conclude the Board accurately described a "map *and accompanying report*." (Emphasis added.)

Sound Action next challenges the Board's finding of fact 47 that the County did not err in relying on the macroalgae survey. Sound Action argues the "macroalgae survey . . . was not conducted per standard statewide protocols" and deviated from those protocols unjustifiably. Even so, it acknowledges the

17

"County's consultant," Greene, "testified that the macroalgae survey was sufficient for a *preliminary* survey." But, it argues the "survey did not qualify as an *advanced* survey of baseline conditions . . . necessary to later measure net loss." (Emphasis added.) We disagree.

As Sound Action concedes in its brief, "compliance with the [standard statewide protocols or] Guidelines is not expressly required outside of the WDFW permitting process." Sound Action otherwise fails to cite any binding authority holding a county must follow the protocols or guidelines in their preliminary survey. DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.").

We thus hold Sound Action failed to establish the Board's challenged findings on macroalgae data were "clearly erroneous" or that the administrative record is insufficient to persuade a fair-minded person of the declared premise. DaVita, 137 Wn. App. at 181.

b. Adverse Impacts and Offsetting

Sound Action next challenges the Board's finding of fact 51 that Greene "evaluated the potential impact of shading, concluding that there would not be a probable impact to existing macroalgae." It argues that, "[w]hile Greene testified broadly that she considered shading, there is *no* evidence that she evaluated shading by the shellfish cage clusters" or "the 5-line arrays that were ultimately approved." (Emphasis added.) The focus of Sound Action's argument is on Greene's single passing comment regarding "*a line* going across the top of" the

macroalgae, and on the lack of reference to shellfish cage clusters.

Sound Action's argument disregards the totality of Greene's testimony, which explained the general timing of the growth season. That is, Greene testified that the farmed kelp would be harvested before the macroalgae's growth season. Thus, the clusters would not provide shade on the macroalgae at the most important time of its growth cycle.

Sound Action also briefly challenges the Board's finding of fact 52 that, "[e]ven assuming there was substantial shading of native kelp due to the Project, that would be offset by the kelp that is being cultivated, which is also native."

Sound Action's challenge discounts—in a manner this court may not—Cziesla's testimony that, even "if you were to assume it was a substantial reduction in that kelp" due to shading, "you would still have services provided by the kelp that's being cultivated." He then further explained how the cultivated kelp is a "species that's native here" and gave numerous examples of how it would provide habitats or support for marine wildlife in the area.

Similarly, Sound Action also contests the Board's finding of fact 27 and relatedly conclusion of law 23 that "Greene concluded the Project would not result in a net loss of ecological functions or process" and that "DNRP scientists were generally in agreement with Greene." Sound Action repeats arguments already addressed above regarding Greene's usage of public comments and her purported reliance on an incomplete understanding of the project site.

Sound Action now also cites to evidence it claims shows "internal County scientists disagreed with Greene." Namely, it cites an email from a County employee, who in discussing the NMFS letter, states "'[i]t appears Anchor is

19

suggesting allowing them to quantify the loss after the fact—but with no mitigation and the like.'" (Emphasis omitted.)  Even if there was a staff member who believed the quantification of net loss must be completed prior to approval *and* that that was lacking (which is not clear from that one statement), that fact is not inconsistent with the finding that "generally" DNRP scientists agreed with Greene.

Cziesla also testified that any loss from the farm would be offset.  As also discussed earlier, the SSDP and MDNS impose numerous mitigation and monitoring requirements to ensure no net loss occurs.  And a reasonable person could conclude that these provisions are not toothless as Spranger is subject to "code enforcement" and possible "permit revocation" in the event of noncompliance.

Sound Action next briefly challenges the Board's finding of fact 53 that it "failed to show the Project will adversely affect macroalgae" as it is "sited in an area with minimal macroalgae" around only two of the six anchors.  It cites to Cziesla's testimony, where he stated that "only one [line] would potentially cause some limited shading impacts," and alleges the aforementioned macroalgae survey was "incomplete."  Sound Action also repeats these arguments when challenging conclusion of law 19.

Sound Action's argument ignores further testimony by Cziesla that "you've got many more times – much more of the amount of kelp present from the farm array than the amount that would be potentially lost from one array."  Further, the project is "sited specifically on the . . . project area to avoid the most dense areas that are in the – towards the shoreline" coupled with "the north/south orientation" has "minimized the – the shading effects."

As for the completeness of the survey, Sound Action's cited testimony actually acknowledges the already discussed WDFW guidelines are not binding, but nonetheless argues the survey was insufficient. Regardless, Greene testified the survey complied with WDFW's guidelines for preliminary surveys and that it was sufficient to evaluate the impact to macroalgae and eelgrass.

We hold Sound Action failed to establish the Board's challenged findings gauging adverse impacts on macroalgae were "clearly erroneous" or that the administrative record is insufficient to persuade a fair-minded person of the declared premise. DaVita, 137 Wn. App. at 181.

C.     Erroneously Interpreted or Applied the Law

Sound Action next claims that the Board erroneously interpreted or misapplied the law. This court reviews the Board's legal determinations under the "'error of law standard.'" Verizon Nw., Inc. v. Emp't. Sec. Dep't, 164 Wn.2d 909, 915, 194 P.3d 255 (2008) (citing RCW 34.05.570(3)(d)). This standard permits this court, in appropriate circumstances, to substitute its view of the law for that of the Board. Id. That said, "'[w]e accord deference to an agency interpretation of the law where the agency has specialized expertise in dealing with such issues, but we are not bound by an agency's interpretation of a statute.'" Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 154 Wn.2d 224, 233, 110 P.3d 1132 (2005) (alterations in original) (quoting City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 136 Wn.2d 38, 46, 959 P.2d 1091 (1998)).

Here, Sound Action argues the Board erroneously interpreted or misapplied SEPA, the County's SMP, and other provisions of the KCC. We address each in turn.

21

1. <u>SEPA</u>

Under SEPA, the "[s]election of environmental review process and protection is left to the sound discretion of the appropriate governing agency, not this court," meaning "[w]e review a decision to issue an MDNS under the 'clearly erroneous' standard." <u>Anderson</u>, 86 Wn. App. at 302 (quoting <u>Pease Hill Cmty. Grp. v. Spokane County</u>, 62 Wn. App. 800, 809, 816 P.2d 37 (1991)). A decision is clearly erroneous "when, although there is evidence to support it, the reviewing court on the record is left with the definite and firm conviction that a mistake has been committed." <u>Id.</u> Further, "[f]or the MDNS to survive judicial scrutiny, the record must demonstrate that 'environmental factors were considered in a manner sufficient to amount to prima facie compliance with the procedural requirements of SEPA,' and that the decision to issue an MDNS was based on information sufficient to evaluate the proposal's environmental impact." <u>Id.</u> (quoting <u>Pease Hill</u>, 62 Wn. App. at 810).

a. Burden of Proof

The Board's conclusion of law 7 states that, to "satisfy [its] burden, Sound Action must present sufficient evidence such that the Board is left with a definite and firm conviction that the Project will have a significant impact despite any conditions imposed on the MDNS and Permit."

Sound Action argues the Board applied the wrong burden of proof. Sound Action relies on <u>Murden Cove Pres. Ass'n v. Kitsap County</u> for its claim that the correct burden of proof is that the Board simply must be left with a "'definite and firm conviction that *a mistake has been committed*.'" 41 Wn. App. 515, 523, 704 P.2d 1242 (1985) (emphasis added) (quoting <u>Ancheta v. Daly</u>, 77 Wn.2d 255, 259–

22

60, 461 P.2d 531 (1969)).  Crucially, Sound Action does not explain what the "mistake" must be about.

The Board's conclusion of law answers that query consistent with <u>Anderson</u> and the applicable regulation, which states that, if an "MDNS is issued and an appealing party proves that the project will still produce significant adverse environmental impacts, then the MDNS decision must be held to be 'clearly erroneous' and an EIS must be promulgated."  86 Wn. App. at 304; <u>see</u> <u>also</u> WAC 197-11-350(2) (requiring an EIS be completed if, in the determination phase, if the proposal "continues to have a probable significant adverse environmental impact, even with mitigation measures.").  In other words, the Board must be left with a firm conviction that a mistake occurred *about the significant adverse impact*, not simply any kind of mistake.

And that is what the Board's conclusion of law goes on to accurately state, namely, that "Sound Action must demonstrate that environmental factors were not adequately considered in a manner sufficient to establish prima facie compliance with the procedural requirements of SEPA."  Thus, we hold Sound Action failed to establish a clear error of law occurred.  <u>Anderson</u>, 86 Wn. App. at 302.

b.  Optional DNS

Sound Action next challenges the Board's conclusion of law 17 that "Sound Action has not met its burden of showing King County's use of the optional DNS process for the Project was clearly erroneous" in two ways.

First, Sound Action argues the "County did not have a reasonable basis" before opting for the optional DNS process.  Under WAC 197-11-355(1), an

agency may opt for the optional DNS process when it "has a reasonable basis[10] for determining significant adverse environmental impacts are unlikely." Sound Action appears to reiterate its earlier addressed argument on finding of fact 11 that the County had not yet engaged in a review before issuing its NOA. Without more, we again reject this argument here, especially in light of RCW 43.21C.075(3)(d) ("procedural determinations made by the responsible official shall be entitled substantial weight").

Second, Sound Action argues that the "NOA did not contain mitigation measures or sufficient information about the proposal to fully understand and comment on it." Sound Action does not specifically describe what information it feels was missing from the NOA. Regardless, the NOA's description includes the project's exact location, approximate dimensions/acreage, approximate depth, and details what will be cultivated at the farm, and more. Further, WAC 197-11-355(2)(b) only requires "the conditions being considered to mitigate environmental impacts, *if a mitigated DNS is expected*." (Emphasis added.) While Sound Action complains the NOA did not list said mitigation measures or conditions, it provides no citation to the record to indicate the County was considering an MDNS before the NOA was issued.

We thus hold Sound Action failed to show the NOA violated SEPA

---

[10] At oral argument, Spranger's counsel explained the County's reasonable basis was supported by testimony on their preliminary review of regulatory compliance, the multi-month discussion with Spranger, and the County's experience with similar projects. Wash. Ct. of Appeals oral argument, Sound Action v. King County, No. 86228-6-I (Jan. 23, 2025), at 16 min., 23 sec. through 17 min., 35 min. video recording by TVW, Washington State's public Affairs Network, https://www.tvw.org/watch/?clientID=9375922947&eventID=2025011577.

requirements or was otherwise clearly erroneous. Anderson, 86 Wn. App. at 302.

c. MDNS

Sound Action next challenges the Board's decision to uphold the MDNS as referenced in conclusions of law 18 through 20. Its argument largely reiterates its already addressed arguments on whale entanglement, kelping, and macroalgae shading.

Sound Action additionally argues, however, that "the Board erred in upholding County's *improper segmentation* of its environmental review by considering only three five-line arrays and deferring review of full-build out to a later date." Sound Action's argument ignores the fact that the SSDP limited the site to only three arrays. Its argument also disregards Spranger's acknowledgment that he would need additional authorization to expand further.

Additionally, Sound Action's summarily cited caselaw also does not appear to require every feasible expansion of a project be considered prior to issuing an MDNS. For instance, our Supreme Court in Cheney v. City of Mountlake Terrace held that, while an "agency cannot close its eyes to the ultimate probable environmental consequences of its current action . . . it is impractical if not impossible to identify and evaluate every remote and speculative consequence of an action." 87 Wn.2d 338, 344, 552 P.2d 184 (1976) (citation omitted); see also King County v. Boundary Review Bd., 122 Wn.2d 648, 663, 860 P.2d 1024 (1993) (noting need for an EIS for some, but not all, future developments such as proposed annexations to cities and rezoning which could lead to an industrial park); Murden Cove, 41 Wn. App. at 526 (referencing a rezoning matter and reiterating SEPA does not require review of every remote and speculative

25

consequence).

Second, Sound Action briefly argues that the "County failed to evaluate simple alternatives like moving portions of the facility into deeper water to avoid shading kelp or to a location that would avoid whale presence." We reject this argument as it cites no authority that requires consideration of alternatives. DeHeer, 60 Wn.2d at 126.

We hold Sound Action failed to show the MDNS was noncompliant with SEPA requirements or that it was otherwise clearly erroneous. Anderson, 86 Wn. App. at 302.

2. KCC and SMP

"All development on the shorelines of this state undertaken after June 1, 1971, must conform to the" Shoreline Management Act of 1971 (SMA), chapter 90.58 RCW. Buechel v. Dep't of Ecology, 125 Wn.2d 196, 203, 884 P.2d 910 (1994). In short, "the SMA was based upon the recognition that shorelines are fragile and that the increasing pressure of additional uses being placed on them necessitated increased coordination in their management and development." Id. Thus, the "SMA requires all local governments to develop regulations ('shoreline master programs') to plan for the reasonable uses of the shorelines." Id. Here, Sound Action alleges the County, and thus the Board, acted in contravention of King County's SMP and various KCC provisions. We disagree.

As a preliminary note, Sound Action contests the Board's conclusion of law 21 which accords substantial weight to the County's interpretation of its own SMP. This court reviews the Board's conclusions of law de novo. Edelman, 160 Wn. App. at 303. Thus, we need not reach this argument.

26

a. Safe Unobstructed Passage of Fish and Wildlife (S-538)

SMP Policy S-538 states in pertinent part that the "County shall require all developments . . . allow for the safe, unobstructed passage of fish and wildlife." King County Off. of Performance Strategy & Budget, 2016 King County Comprehensive Plan Policy S-538 to S-718 (updated Oct. 29, 2018) [https://perma.cc/XGR7-V8Z5]. Sound Action argues the Board's conclusion of law 28 erroneously states the project site complied with this requirement. In so arguing, Sound Action acknowledges the undisputed evidence that the "Colvos Passage may be physically wide" but nonetheless reiterates its arguments on entanglements and kelping which we already addressed in the substantial evidence section. It is otherwise unclear what *legal* error Sound Action claims occurred here. Thus, we hold Sound Action failed to establish the Board misinterpreted SMP Policy S-538.

b. Critical Saltwater Habitat (S-539, S-631)

Sound Action next argues the Board's conclusion of law 30 improperly states the project site was not a critical saltwater habitat. Further, it argues the Board erred in finding the site did not constitute a "kelp bed." We disagree.

KCC 21A.06.261 states that "[c]ritical saltwater habitat[s]" include "all kelp beds, eelgrass beds . . . with which priority species have a primary association." SMP Policy S-539 blocks projects which "adversely impact . . . critical saltwater and freshwater habitats." SMP Policy S-631 requires in pertinent part that any "project . . . will result in no net loss of ecological functions associated with a critical saltwater habitat." The above provisions do not define "kelp beds" or "primary association."

The Board heard testimony from Greene that there were "[n]o kelp beds" near the site, only "some kelp scattered on the – on the substrate on the bottom." The site photos provided in the record appear consistent with this testimony. With the testimony in mind, if the drafters of the SMA or SMP intended for a critical saltwater habitat to exist whenever kelp is present at a site, they would not have included the limiting words of "kelp *beds*" or "*primary* association." Puget Soundkeeper All. v. Pollution Control Hr'gs Bd., 30 Wn. App. 2d 360, 382-83, 545 P.3d 333 (2024) (interpretations must not render words within a regulation meaningless). Further, Sound Action's proposed definition would lead to the extreme result of rendering most, if not all, of Puget Sound as a critical saltwater habitat if *any* kelp is present. Bayley Constr. v. Dep't of Labor & Indus., 10 Wn. App. 2d 768, 790, 450 P.3d 647 (2019) (interpretations must not lead to unlikely or absurd results).

Sound Action also cites to WAC 220-660-320(3)(b)(x) which it claims classifies kelp beds "without treating 'kelp' differently. Regardless, this provision is inapposite as chapter 220-320 WAC plainly deals with "hydraulic code rules," defined in WAC 220-660-010 as the "construction or performance of work that will use, divert, obstruct, or change the natural flow or bed of any of the salt or fresh waters of the state." As such, we hold that Sound Action failed to establish the Board misinterpreted S-539 or S-631.

c. No Net Loss (S-601, S-718)

SMP Policy S-601 states that the County "shall ensure that new uses . . . do not cause a net loss of shoreline ecological processes and functions." Similarly, SMP Policy S-718 states "[a]quaculture shall not be permitted where it would result

in net loss of shoreline ecological functions."  KCC 21A.25.110(D)[11] similarly prohibits aquaculture projects "that would result in a net loss" while KCC 21A.25.080(A)(1) sets "avoiding the impact altogether" as its top priority for mitigation measures.

In citing the above for its challenges of conclusions of law 23, 24, and 31, Sound Action cross-references its arguments concerning macroalgae shading which were already addressed in our substantial evidence section.  It also repeats its argument that the County was required to consider alternatives, but again cites no authority that such an action was actually required.  Accordingly, we hold that Sound Action failed to establish the Board misinterpreted SMP Policy S-601, SMP Policy S-718, or the related KCC provisions.

D.    Arbitrary and Capricious

Sound Action briefly asserts the Board's decision was arbitrary and capricious because it "willfully disregarded the overwhelming evidence of high whale use at the site."[12]

To succeed on its "arbitrary or capricious" claim, Sound Action must establish the Board's "decision [was] 'willfully unreasonable, without consideration

---

[11] The County asserts that Sound Action "raises for the first time on appeal that the Board erroneously interpreted or applied" KCC 21A.25.110(D) and urges us not to consider it under RAP 2.5(a).  Even assuming arguendo the County's assertion is accurate, Sound Action's arguments on KCC 21A.25.110(D) are directly related to SMP Policy S-718.  As such, we use our discretion under RAP 2.5(a) to consider KCC 21A.25.110(D).

[12] At oral argument, Sound Action confirmed its arbitrary and capricious argument solely addressed its claim that the Board "disregarded the facts and circumstances of a substantial amount of whale sightings at the project site, at the vicinity of the site . . . not the entire case."  Wash. Ct. of Appeals oral argument, supra at 2 min., 10 sec. through 2 min., 22 sec.

and in disregard of facts or circumstances.'" DeFelice v. Emp't Sec. Dep't, 187 Wn. App. 779, 787-88, 351 P.3d 197 (2015) (quoting W. Ports Transp., Inc. v. Emp't Sec. Dep't, 110 Wn. App. 440, 450, 41 P.3d 510 (2002)); see also Saldin Sec., Inc. v. Snohomish County, 134 Wn.2d 288, 305 n.9, 949 P.2d 370 (1998) (describing the "quintessential arbitrary and capricious act" as deciding an issue "based on a flip of a coin, with total disregard of the facts and circumstances") (Talmadge, J., concurring).

As discussed above, Sound Action's argument disregards both Cziesla's testimony and the Board's explanations for rejecting Carey's and Brooks' evidence. Thus, we hold the Board's particularized weighing of the evidence on whale sightings was not "without consideration" or in "disregard of facts." DeFelice, 187 Wn. App. at 787. "It is not arbitrary and capricious if the decision is 'exercised honestly and upon due consideration, *even where there is room for two opinions*.'" Id. at 788 (quoting W. Ports, 110 Wn. App. at 450) (emphasis added).

### III.   CONCLUSION

We affirm.

Díaz, J.

WE CONCUR:

Feldman, J.

Chung, J.

30